Nina **MORTELLITO** and Nina Needle-point, Inc., Plaintiffs,

v.

**NINA OF CALIFORNIA, INC.,** et al., Defendants.

No. 71 Civ. 4346.

United States District Court, S. D. New York.

Jan. 6, 1972.

---

Orans, Elsen & Polstein, New York City, for plaintiffs by Jerome T. Orans, New York City, of counsel.

Christy, Frey & Christy, New York City, for defendants by Arthur H. Christy, David P. Steinmann, New York City, of counsel.

GURFEIN, District Judge.

This is an action to enjoin alleged violation of the Lanham Act (15 U.S.C. §§ 1051–1127), to enjoin alleged unfair competition, and to obtain an accounting of gains and profits derived from the unfair competition, as well as judgment for compensatory and punitive damages against certain of the defendants.[1] The jurisdiction of the Court is founded on 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a). Pendent jurisdiction is alleged with respect to the unfair competition claims under New York law, relying on 28 U.S.C. § 1338(b).[2]

---

1. In addition to the general claim based on the New York law of unfair competition, there are two other claims resting on allegations of a malicious intent to deceive the public and to steal the name, mark and business of the plaintiffs, on the part of Donald Leitman, President of Nina of California, Inc., and on the part of Lord & Taylor. Since these claims go mainly to the issue of damages, and since the parties did not expressly address themselves to these claims, they will not be further considered in this opinion.

2. The joinder of the department store defendants who bought from Nina of

The action is brought by Nina Mortellito (Nina) and Nina Needlepoint, Inc. (Nina Inc.) to enjoin Nina of California, Inc. (Nina-Cal) from using the mark "Nina" in connection with the sale of needlepoint kits, patterns or canvasses manufactured by Nina-Cal. Such kits are presently being sold in New York City by the defendants R. H. Macy & Company, Inc. (Macy's), Associated Dry Goods Corp. (Lord & Taylor), and Federated Department Stores, Inc. (Abraham & Strauss); and injunctive relief is also sought against further sales of such needlework products by these store defendants.

A motion was made for a preliminary injunction. The Court ordered a hearing for the determination of disputed issues of fact. Thereupon, a stipulation was entered into by the parties that the hearing so ordered "may, pursuant to [Fed.R.Civ.P.] 65(a) (2) be considered . . . to be a trial on the merits of this action, except that the trial of the issue of damages is to be deferred until after the trial of the other claims raised in the complaint." A hearing was held and testimony taken. The testimony disclosed the following.

The art of needlepoint involves stitching wool through a pattern which has been drawn on a meshed canvas; different colors of wool are used for each color on the canvas. Depending on its size, the finished canvas can be used for anything from an eyeglass case to a rug. Generally, the larger the canvas the more expensive it is.

Needlepoint sewing has been taken up as a hobby by an increasing number of women, and even by some men. It is, nevertheless, a tiny industry.

Nina is a young woman of great artistic ability who turned her talent for design to the creation of canvasses for needlepoint about fourteen years ago. She has received the Audubon Exhibit award; the New Jersey and Cleveland Museums have exhibited her work. She has received prizes for her needlepoint design from the Lighthouse, which conducts the largest national exhibition of needlepoint in the United States. In their catalog she is described as the designer "Nina."

In 1965, she began the practice of signing all her canvasses with the mark "Nina," which is uniformly in block letters. At that time she also began wholesaling her designs exclusively to Alice Maynard, a well known needlepoint store on Madison Avenue in Manhattan, which in turn sold Nina's designs to stores in Chicago, Minneapolis and Nantucket. Over the years, Nina expanded her market, supplying shops in Westhampton, Baltimore, Philadelphia, Boston and Nantucket. She also sold to shops in California belonging to her sister, Jebba Maes, as will later appear.

Then, in 1970 Nina stopped selling to Alice Maynard, incorporated her own business, locating it on Madison Avenue, and began selling to many more stores from Naples, Florida to Seattle, Washington. She also opened a retail store of her own on Madison Avenue.

Since August 1, 1970 she has opened five Nina Needlepoint franchises at Stonington and Greenwich, Connecticut; Locust Valley, New York; Philadelphia; and Chicago. She gives her franchise dealers a logo and a shopping bag; she puts in their initial stock of yarn and canvasses; she sets them up as an operating store. They use her mark "Nina" in block letters, but must use her marked goods exclusively.

Nina Inc. now possesses an inventory which includes about 800 original designs, of which it reserves about 300 for its franchise dealers. It sells on both a retail and a wholesale basis, most of its sales being wholesale. The total sales of Nina Inc. from August 1, 1970 to July 31, 1971 amounted to approximately $184,000, representing an output of about

California, Inc. destroys diversity jurisdiction since plaintiff Nina Mortellito is a New York resident and plaintiff Nina Needlepoint, Inc. is a New York corporation, while defendant R. H. Macy & Co., Inc. is also a New York corporation.

12,000 "Nina" canvasses per year, or an average of 1,000 per month. It sells much of its merchandise at prices of about sixty dollars (canvas, wool and needle). But it also sells a wide variety of canvasses retailing from $7.50 to $15. There are 89 designs retailing at $7.50 and over 100 designs retailing at $15. The average price for plaintiff's needlepoint canvas of the same size as that sold for $10 to $14 by Nina-Cal is $60 at retail.

Nina Inc. has done some advertising in *House & Garden, Town & Country, Cue* magazine, WGCH radio station in Greenwich, and the Charleston Evening Post. Local advertisements mentioning Nina also have been run by her customers. While the volume of advertising is not large it is in keeping with the nature of the needlepoint business, a small industry. Nina has received a good deal of media coverage gratis, because of her reputation. She has been written about in *Life* magazine on May 28, 1971, the New York Times on September 7, 1970 and *McCall's* magazine in March 1971; as well as the Chicago Daily News on September 17, 1971, the Middletown, New Jersey Daily Register of December 16, 1970, the Charleston News and Courier of March 26, 1970, and the French fashion magazine *Elle* of November 15, 1971.

The good will of the plaintiff embodied in the mark "Nina" was testified to by several witnesses: Erica Wilson, a writer and owner of needlepoint shops in Nantucket and Southampton; Charles Quaintance, Jr., Vice-President of Alice Maynard; Louise Hendrix, a Nina franchise dealer with stores in Stonington and Greenwich; Shirley Shaffer, buyer for a Great Neck store; Carol Devendorf, a Nina franchise dealer in Locust Valley; and Jebba Maes, the sister of Nina. The defendants, on the other hand, called several of their buyers who testified that they never heard of Nina or Nina Needlepoint, Inc.[3] In addition, Mary Colucci, editor of *Sew Business* and *Art Needlework Quarterly*, with a circulation of about 11,000, testified similarly. Her magazines do not go to consumers; and advertising of Nina of California has been carried by them as well as an "editorial" about that firm submitted by Leitman himself.

The history of the defendant, Nina-Cal, can be recounted more briefly. It was incorporated in California in February 1971 and at once began preparing to produce needlepoint kits, which were first shipped in interstate commerce about May 1, 1971. These kits are sold in plastic bags and contained a canvas, some wool, a needle, a reproduction of the design, and instructions. They are attractive kits; the plastic bag is transparent so that the customer can see the reproduced design of the canvas. The canvasses differ from Nina's in that, *inter alia*, they are not hand-painted. They are painted by a silk-screen process which is, of course, a much cheaper process than hand-painting. Accordingly, they sell for less than one-quarter of her price. They are, however, like Nina's in that some of the designs appear to be copies of Nina Inc.'s designs.[4] The kits also bear the legend "Nina of California." They appear to be packed so that "Nina" is clearly visible while "of California" is not easily read. The kits of Nina-Cal are now being sold to over 400 stores in over 40 states and Canada.

---

3. These were defendant Lord & Taylor's buyer, Deborah Bond; defendant Macy's buyer, Mary Schory; and by affidavit defendant Abraham & Strauss' buyer, Valerie Winberry, and Macy's Corporate Market Representative in charge of art needlework, Maurice Wasserman.

4. One in particular, a design by Nina's sister, Jebba Maes, of a gum ball machine with the gum balls floating in defiance of gravity is nearly identical with one of Nina-Cal's canvasses. It was displayed in Jebba's Beverly Hills shop when it was visited by Leitman. I find it to have been copied by Nina-Cal in spite of the testimony that the design was independently conceived in school by the daughter of Nina-Cal's designer, Nina Montalbano. I also find that some of the animal heads put out by the two companies are strikingly similar and were copied by Nina-Cal.

Sales in the first five months of the corporation's existence consisted of about 17,000 canvasses for a total of $85,000.

The parties are in sharp dispute as to how the defendant Nina of California, a newcomer in the business, happened to take, as part of its trademark, the name "Nina."

The defendant's President, Donald Leitman, testified that he had previously been in the business of selling automobile tires through leased departments in department stores. He was also employed in late 1970 and early 1971 by Tec Cash Register. He had never had anything to do with needlepoint. His wife suggested one day that needlepoint canvasses produced cheaply would be a saleable item. He telephoned one of Jebba Maes stores in early January 1971 and made an appointment.

The Jebba Maes stores in California sold needlepoint canvasses at retail and featured Nina's designs. Jebba Maes, Nina's sister, ran them. She was also part owner of a company named Pippin Products, Inc., which produced both hand-painted canvasses and others by the silk-screen process, the latter being under the mark "One West."

Leitman told Stephen Alsberg, then production manager of Pippin Products, that he wanted to sell their needlepoint products in leased departments of department stores. Leitman then discovered that there were very few leased departments of that sort. He then offered to sell their One West kits on a trial basis. Dottie Eisenberg, a partner of Jebba Maes, told him she was interested in selling her interest in the business. Leitman asked for figures on their operation and a balance sheet. He elicited from them their costs of production, including the costs of outside silk screening, packaging and raw materials. After three or four meetings he finally decided not to buy into their business.

Leitman testified that, around the end of January, he decided to go into the needlepoint business himself. He got in touch with John Montalbano (John)

whom he had known for fifteen years, and invited him to join in starting a new venture. John was in the advertising business and familiar with artwork. His wife, also named Nina, was an artist, as was their daughter, Marguerite, age 24. Nina Montalbano admitted, however, that she had had no previous experience in needlepoint designing.

It is Leitman's version, supported by Nina Montalbano, that the name "Nina" was picked fortuitously from a number under discussion without reference to Nina of Nina Needlepoint, Inc., of whom Nina Montalbano professed never to have heard. Nina Montalbano was to be the designer, and hence the name "Nina." The words "of California" were added at Leitman's suggestion to create a note of "glamour." Leitman denied that he had noticed "Nina" on canvasses when he visited Jebba's store. He testified that he had only noticed the designs, not the "name." He did admit that, before the discussions with John about forming his own business, he had heard of Nina Mortellito and knew that she was a needlepoint designer. He admitted that Jebba had asked him whether he knew she had a sister who had a retail store in New York, and who had started her in business, but he did not recall being told that Nina had drawn the designs he had seen in the Jebba store.

The version put forward by the plaintiffs is in sharp contrast. Robin Alsberg, the wife of Stephen Alsberg, and formerly a salesperson in the Jebba store in Beverly Hills, saw Leitman come in with another man and look around the shop. He stayed in the front of the store, looking at the "Nina" canvasses which were on display there. She identified Nina designs that were in the store when Leitman made his visit. These all bore the signature "Nina." Stephen Alsberg testified that, in his talks with Leitman about his becoming connected with Pippin Products in some manner, he had explained to Leitman that they sold Nina's designs, that she sold well, and that she had a store in New York. He instructed Leitman in the entire produc-

tion end of the business. Jebba Maes testified that she gave Leitman information on how to make silk screens, as well as the names of suppliers and customers. She told him that her sister Nina was the leading animal designer, and that her designs could not be properly screened because they were too intricate. She swore that she specifically showed him canvasses by Nina and explained to him why hand-painted canvasses cost more than silk-screened canvasses.

█ I accept the plaintiff's version of the disputed matter. I do not accept the defendant's version. I find that Leitman knew about Nina's reputation as a designer in the needlepoint field and that the name "Nina" was chosen to cash in on the plaintiff's reputation. I find also that Nina Montalbano copied, among others, Jebba's gum ball machine design.[5]

There has been testimony of actual confusion as to source, albeit principally from business customers of the plaintiff rather than from ordinary consumers.[6] The two concerns are not in head-on competition, but they are in the same field—canvasses with designs for needlepoint. The plaintiff has been improving its business and seems to be on the threshold of growth. The defendant, Nina-Cal, is at the beginning of its business, has scarcely had time to build a reputation and concedes that it is its *product,* not the name "Nina of California," which sells. Apparently the sales of the defendant will suffer little or not at all if it is not permitted to use that name, so similar to that of the plaintiff.

The defendant Nina-Cal received notice of infringement as early as May 15, 1971.[7] The plaintiff's attorney notified the defendant that Nina Needlepoint, Inc. had for some time been engaged in the sale nationally of needlepoint designs,

"being those of Nina Mortellito who has . . . achieved a national reputation as the leader in the field." The attorney also complained that the defendant "had taken the name Nina" and was "selling needlepoint designs using the name of our client . . . and designs so closely related to those of our client as to suggest a deliberate intention to cash in on our client's name and reputation." The letter indicated that the defendant's actions had already "created great confusion among our client's customers and seriously injured our client's position." The defendant was pointedly asked to cease using the name "Nina" in connection with needlepoint products as well as to cease using designs created by Nina. The defendant did not reply to the letter but instead consulted its attorney, who advised it to indemnify Lord & Taylor, a customer, and to send a copy of the indemnity to the plaintiff's attorney. There is no evidence that any investigation was made of the rights or standing of Nina Inc.

At the time the defendant was formally requested to desist, it had about 10,000 plastic bags with the imprint "Nina of California." Leitman did not recall how many catalogs were printed, nor how much of other articles bearing the name "Nina of California" were then in inventory. Leitman claims to have actually started to sell about May 1.

At present, Nina-Cal does have an inventory of articles imprinted with "Nina of California," including numerous silk screens. However, there was testimony from Pippin Products' former production manager, Stephen Alsberg, that it is relatively easy to change the name applied by a silk-screening process. Leitman himself denied knowing how much it would cost to change the name of his product. At the time of the hearing Leitman said that direct advertisements, exclusive of catalogs, had cost $1,500.

---

5. See note 4 *supra.*

6. Among others, Erica Wilson and Charles Quaintance, Jr., testified to their own confusion; and Carol Devendorf, Louise Hendrix, and Clara Barraque, the store manager of Nina Inc., told of confusion among their customers.

7. As is implicit in this opinion, the defense of laches is rejected by this Court.

In the light of the foregoing findings of fact, the equities strongly favor the plaintiff.

While it is a traditional commonplace that in this type of case the facts rather than precedents alone tend to guide the decision, see 1 H. Nims, Unfair Competition and Trade Marks 670 (1947), authority must be sought to find the rubric of both statute and case law.

I

■ Regarding the claim under the Lanham Act, it is not a prerequisite that the mark be registered. See Section 45, 15 U.S.C. § 1127. A claim for relief arises if the defendant affixes to the goods a false designation of origin or any false description or representation. The defendant is subject "to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation" (§ 43(a); 15 U.S.C. § 1125(a)).

■ The gist of the action under this section is a use of the mark or tradename in interstate commerce which is likely to cause confusion or to deceive purchasers as to the source of origin of the goods. Geisel v. Poynter Products Inc., 283 F.Supp. 261, 266–268 (S.D.N.Y. 1968); 1 R. Callmann, Unfair Competition, Trademarks and Monopolies § 18.2 (b), at 622–23 (3d ed. 1967). A false representation or description would be violative of § 43(a) even though the plaintiff is not a direct competitor of the defendant. 1 R. Callmann, *supra*, at 625. See Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 151 (9 Cir.), cert. denied, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963); L.

E. Waterman Co. v. Gordon, 72 F.2d 272, 273 (2 Cir. 1934); Restatement of Torts §§ 730–31 (1938).[8] The degree of indirect competition is great enough to give the plaintiff standing to sue, as one who "is or is likely to be damaged" by the defendant's use of his mark or tradename, where the goods are the same or closely related, even if the defendant sells its goods for less than the plaintiff. J. Calimafde, Trademarks and Unfair Competition § 10.29 (1970); Yale & Towne Mfg. Co. v. Alder, 154 F. 37, 38 (2 Cir. 1907).

■■ Although, on its face, Section 43(a) seems to be for the benefit of the person who believes he is likely to be damaged, the emphasis has largely remained on confusion of the public.[9] Confusion will necessarily be created if a mark or tradename such as "Nina" has acquired a secondary meaning, and if the defendant's mark or tradename exhibits a confusing similarity to it. See Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc., 299 F.2d 33, 36 (2 Cir. 1962); Joshua Meier Co. v. Albany Novelty Mfg. Co., 236 F.2d 144, 147 (2 Cir. 1956). Yet, "when the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit. American Chicle Co. v. Topps Chewing Gum, 2 Cir., 208 F.2d 560, 562; Miles Shoes, Inc. v. R. H. Macy & Co., 2 Cir., 199 F.2d 602, 603; National Van Lines v. Dean, 9 Cir., 237 F.2d 688, 692."

---

8. Although the elements of § 43(a) liability may be *sui generis*, see Mutation Mink Breeders Ass'n v. Lou Nierenberg Corp., 23 F.R.D. 155, 161 (S.D.N.Y. 1959), we can nevertheless look to cases involving common law trademarks or those registered under the Lanham Act for help in defining notions such as "confusing similarity" or in specifying the degree of competitive damage that warrants relief. Cf. Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc., *infra*.

9. At least where injunctive relief is sought, likelihood of confusion suffices to warrant relief. 1 R. Callmann, *supra*, at 624.

Fleischmann Distilling Corp. v. Maier Brewing Co., *supra*, 314 F.2d at 158. As was said in National Van Lines v. Dean, *supra*, 237 F.2d at 692: "if such an intent [to deceive] is shown, it raises a presumption that deception and confusion resulted." Restatement of Torts § 729(b) is to the same effect.

Under the federal guidelines there must be some showing of public confusion. First, it is obvious that Nina, unlike a giant corporation, has not spread her fame into every nook and corner of the land. Yet she has done enough, with her meager means, to become well-known as a designer of needlepoint canvasses. It is true that "Nina" is not the strongest mark imaginable, but it is a rather uncommon name, unlike Mary or Jane. For her name, Nina has acquired a secondary meaning in that her name has been used long and extensively enough to have become known to a substantial number of present or prospective needlepoint purchasers and understood by them to designate the goods of the plaintiffs.[10] On the defendant's argument, only a giant would be entitled to protection, even though the whole industry is small. Secondly, the plaintiff's and defendant's names are undoubtedly similar. While the plaintiff and defendant may not be precise competitors in price and quality, they do sell the same type of product. Thus, secondary meaning and confusing similarity, sufficient conditions for public confusion, are made out. How much confusion will result is not capable of measurement, but there has already been some; and that there is likely to be more, as each expands its business, appears quite predictable.

Moreover, in the case at bar it may be presumed from the wilful appropriation that confusion resulted. I hold that the circumstance of there being a deliberate attempt to cash in on Nina's reputation is evidentiary of her standing in the field, and, hence, of secondary meaning, as well as being evidentiary of the confusing similarity. In sum, relief under the federal claim based on § 43(a) is warranted.

## II

With respect to the claim for relief under the New York law of unfair competition, it is, if anything, easier for the plaintiff to prevail. In Santa's Workshop Inc. v. Sterling, 282 App.Div. 328, 329–330, 122 N.Y.S.2d 488, 489 (3d Dept. 1953), the Court said: "The law of unfair competition no longer requires that plaintiff's business and advertising shall have acquired a 'secondary meaning.' International News Service v. Associated Press, 248 U.S. 215, 235, 237, 39 S.Ct. 68, 63 L.Ed. 211; Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 404, 36 S. Ct. 357, 60 L.Ed. 713, 718. 'The controlling question in all cases where the equity power of the courts is invoked is whether the acts are fair or unfair, according to principles recognized in equity'. Oneida, Ltd. v. National Silver Co., Sup., 25 N.Y.S.2d 271, 276. See also Avon Periodicals, Inc. v. Ziff-Davis Pub. Co., Sup. [27 Misc.2d 160], 113 N.Y.S.2d 737, affirmed 282 App.Div. 200, 122 N. Y.S.2d 92."

When the focus is directed to equitable considerations, the fact that timely warning was given at the threshold of Leitman's activity is not without significance; conversely, consultation with counsel is not a defense. Bennett Bros. v. Floyd Bennett Farmers Market Corp., 22 Misc.2d 833, 836, 197 N.Y.S.2d 882 (N.Y.Co.Sup.Ct.1960).

Also pertinent is the fact that there has been and will be a dilution of the plaintiff's mark. It will be difficult for Nina to maintain a reputation for quality if there is a product with a similar name that is of poorer quality and cheaper. And this detrimental effect will be heightened because, as Judge Motley aptly remarked in Fund of Funds, Ltd. v. First American Fund of Funds, Inc., 274 F.Supp. 517, 526 (S.D.N.Y.1967), "defendant will be operating in an area of normal expansion for plaintiffs to which

---

10. Moreover, this secondary meaning was certainly established by February of 1971.

new area equity will extend its protection."

New York has an anti-dilution statute which reads:

"Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." General Business Law § 368–d (McKinney's Consol.Laws, c. 20 (1968)).

Dilution is an injury that differs materially from that arising out of the orthodox confusion. Even in the absence of confusion, the potency of a mark may be debilitated by another's use. This is the essence of dilution. Confusion leads to immediate injury, while dilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark. 3 R. Callmann, *supra*, at 955–57.

 Here we find what Judge Geller of the New York Supreme Court called a "'whittling down' [of] the identity and reputation of plaintiffs' names." Renofab Process Corp. v. Renotex Corp., 158 N.Y.S.2d 70, 77 (N.Y.Co.Sup.Ct. 1956). He held that, in New York: "[t]he likelihood of damage through 'dilution' of its mark or symbol is enough." (*Id.*) Therefore, the plaintiffs are certainly entitled to relief under the more lenient state standards, which focus more on notions of equity and dilution than does the Lanham Act.[11]

Accordingly, on state and federal grounds the plaintiffs are entitled to an injunction enjoining the defendants from manufacturing or selling needlepoint products in any combination of words containing the word "Nina." [12]

The foregoing constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Settle order on notice conforming to Fed.R.Civ.P. 65(d).

---

11. However, since a violation of the federal law was also found, we need not face any constitutional problems which the state law's leniency might present under the *Sears-Compco* doctrine. See Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); The Supreme Court, 1963 Term, 78 Harv.L.Rev. 143, 312 (1964).

12. See Douglas Laboratories Corp. v. Copper Tan, Inc., 210 F.2d 453 (2 Cir. 1954), modifying 108 F.Supp. 837 (S.D. N.Y.1952); Coca-Cola Co. v. Dixi-Cola Laboratories, Inc., 155 F.2d 59, 65–66 (4 Cir.), cert. denied, 329 U.S. 773, 67 S.Ct. 192, 91 L.Ed. 665 (1946).