Jeanne FERRARA, Carl Ferrara and J & C Ferrara Co., Inc., Plaintiffs,

v.

Leon SCHARF, Dave Scharf, Manuel Scharf, Ernest Katz, Larry Klein and Ferrara Creations, Inc., Defendants.

No. 78 Civ. 3776–CLB.

United States District Court, S. D. New York.

Jan. 16, 1979.

Douglas F. Eaton, New York City, for plaintiffs.

Bernstein & Bernstein, New York City, for defendants.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

By their verified complaint filed August 15, 1978, plaintiffs alleged two claims: (1) that defendants had engaged in misrepresentations and false descriptions as to the origin of their goods in interstate commerce, in violation of 15 U.S.C. § 1125(a); and (2) had engaged in unfair competition and dilution of plaintiffs' unregistered trademark, in violation of § 368–d of the New York State General Business Law. The Court has subject matter jurisdiction of the first claim under 15 U.S.C. § 1121, and has pendent jurisdiction over the second claim. Defendants Leon Scharf, Larry Klein and Ferrara Creations, Inc. ("Ferrara Creations") have answered denying liability. Plaintiffs' motion for a preliminary injunction was consolidated with trial on the merits, pursuant to Rule 65(a)(2), F.R. Civ.P., and tried by the Court without a jury on September 11, 13, 14 and 15, 1978.

Plaintiff J & C Ferrara Co., Inc. ("J & C Ferrara") is a New York corporation having its principal place of business in Massachusetts, where the individual plaintiffs reside. Defendant Ferrara Creations is also a New York corporation having its principal office in New York. Individual defendants Dave Scharf, Manuel Scharf and Ernest Katz were never served. They are not necessary parties. As to them, the action is dismissed.

Plaintiff J & C Ferrara is a wholesale jewelry company owned entirely by plaintiffs Jeanne and Carl Ferrara, who are husband and wife, and who each own 50% of the shares of the corporation. J & C Ferrara was located originally at Purdy's, Westchester County, New York, before moving in 1974 to its present location in North Attleboro, Massachusetts. Since 1975, the plaintiff corporation has maintained a jewelry showroom in the wholesale jewelry district in Manhattan, initially at 389 Fifth Avenue, and presently at 417 Fifth Avenue.

Defendant Ferrara Creations, another wholesale jewelry concern, is the successor corporation to a business of the same name formed in May 1977 in which Abraham Stefansky and Ernest Katz were the sole shareholders. Soon after the formation of Ferrara Creations, negotiations began between the corporation's then owners and the Scharf family. The Scharfs, extensively involved in the nursing home business, had become interested in diversification. They decided to enter the wholesale jewelry business. Negotiations led to a written agreement for the sale of the name and assets of the corporation, excluding liabilities, to the Scharfs. The new Ferrara Creations came into existence on December 2,

1977, when all the assets of the former company including the trade name were transferred pursuant to the written agreement entered into between the former owners and the new principals. The shareholders in the new corporation were and are the Scharf brothers: David and Leon; Leon Scharf's son, Manuel Scharf, and Ernest Katz. Abraham Stefansky retained no interest in the new corporation. In March 1978, as a result of another agreement between himself and the Scharfs, Ernest Katz relinquished his position as officer and shareholder in the corporation, but remained in the employ of the second entity as an advisor and purchasing agent working on a commission basis. Defendant Larry Klein is neither an officer nor a shareholder of Ferrara Creations.

The principal places of business of Ferrara Creations are 48 West 37th Street, New York, New York, and 366 Fifth Avenue, New York, New York.

Since March 1, 1973, plaintiffs have used the trade names "J & C Ferrara" and "Ferrara" in the marketing and sale at the wholesale level, of an extensive line of jewelry primarily in the price range of $10 to $100 retail. Such a line is commonly referred to in the trade as "bridge business," because it comprises the sale of precious metal jewelry at prices which bridge the gap between costume or junk jewelry, and fine jewelry.

J & C Ferrara has made net sales of jewelry at wholesale totalling $1,214,434.09, $1,502,753.83 and $1,483,636.56 during the fiscal years ending February 29, 1976, February 28, 1977 and February 28, 1978, respectively (DX B, C). Mr. Carl Ferrara testified that he expected gross sales to increase in the fiscal year ending February 28, 1979, to approximately $2,000,000.00. While these figures for net sales hardly make J & C Ferrara an industry giant, they do demonstrate that a significant amount of the plaintiff's merchandise on an annual basis enters a market historically dominated by small sellers.

Documentary and testimonial evidence adduced at trial leads to the conclusion that the jewelry designed and marketed by J & C Ferrara is both innovative and of high quality. Plaintiffs' products consist primarily of pendants, which are chains with one or more amulets or charms attached. The company also distributes charms, chains and amulets separately, as well as rings, bracelets, stick pins, tie tacks and earrings. J & C Ferrara has developed an excellent reputation for creativity in its jewelry. It has demonstrated an ability to anticipate trends in consumer demand such as the current fad for "King Tut" items. It was J & C Ferrara which designed and marketed the popular sterling silver and 14-karat gold replicas of the Hershey chocolate kiss, making use of the slogan "give her a kiss."

Although a majority of the jewelry sold by J & C Ferrara is sterling silver, the percentage of total sales consisting of 14-karat gold jewelry is significant and steadily increasing. Plaintiff has a total of 3,031 active accounts throughout the United States; active accounts being defined as those from which the plaintiff has received an order within the last year. Of this total, approximately 300 to 350 are department stores, with the remainder being retail jewelry stores.

Ferrara Creations services a market similar to that of the plaintiff. It also conducts a "bridge business," the difference between the two being that while plaintiff sells jewelry made of silver and gold fill, as well as 14-karat gold, defendant restricts itself to the sale of 14-karat gold jewelry. Ferrara Creations, with between 50 and 60 wholesale accounts inherited from its predecessor, has since grown to 240 accounts, the overwhelming majority of which are department stores. The sales volume of the defendant corporation has grown rapidly along with the growth in the number of wholesale accounts. David Scharf testified that he expected sales totalling $3,000,000 by the end of the current fiscal year, having realized sales of $1,700,000 during the first eight months.

Although the customer lists of the two corporations have remained confidential during the trial, and were not placed in

evidence, there was evidence introduced which demonstrated that the two companies do have a number of wholesale customers in common. This is significant, and points to a congruency existing between the markets serviced by the two companies.

Even more important is the fact that this congruency has resulted in instances of actual confusion between J & C Ferrara and Ferrara Creations, by customers on both the wholesale and retail level, and by at least one supplier.

A number of documents were introduced into evidence at trial tending to show the actual confusion experienced by customers who failed to distinguish between the two concerns. A refund request submitted to plaintiff by Mercantile Stores Company, Inc. was for merchandise not attributable to plaintiff (PS 92A–92D). Similarly, credits were requested by Nordstrom, a department store located in Seattle, Washington for defective merchandise not belonging to plaintiff. A Dallas based department store, Titche's was so confused by the similarity of names of the two companies that it sent an order for merchandise intended for Ferrara Creations to J & C Ferrara's New York City showroom address (PX 94A & 94B). Furthermore, bills were submitted to J & C Ferrara by Gertz department stores for merchandise not belonging to plaintiff (PX 95A–95C), and Gertz returned defective Ferrara Creations jewelry totalling $86.00 in value to J & C Ferrara for repair (PX 96A–96N).

Thus the record contains an abundance of evidence indicating confusion among department store buyers as to the identity of the two companies, which I find arises out of the similarity in names.

But the confusion was not restricted to department store buyers. It also extended to at least one concern which is a supplier to both corporations. Leer Gem Ltd. of New York was sufficiently confused by the similarity of names that it sent gems ordered by Ferrara Creations to J & C Ferrara (PX 97A–97C).

Confusion among retail jewelry store customers of the two companies was evidenced by returns of defective Ferrara Creations merchandise to J & C Ferrara by Ross-Simon's of Warwick, Rhode Island (PX 98A–98D, 99A–99D).

Additional evidence of befuddlement of buyers, and diversion of potential business from J & C Ferrara to Ferrara Creations came in the form of testimony from John Havlir and Donald Tatro. John Havlir is a wholesale jewelry salesman, a close friend and former neighbor of Carl Ferrara. Despite this potential for bias I regard his deposition testimony as credible. In his deposition, he testified to having often recommended J & C Ferrara to wholesale jewelry buyers. Specifically, he recalled referring Ann Strugg, a buyer for D. H. Holmes department store to J & C Ferrara in response to her question with respect to a good source of "King Tut" jewelry. Ms. Strugg never visited J & C Ferrara, but did pay a visit to the Ferrara Creations showroom at 366 Fifth Avenue on June 10, 1977 (PX 111, Tr. pp. 310–11).

The short conversation which allegedly took place between John Havlir and Larry Klein as they crossed the street at Fifth Avenue and 37th Street during November 1977 or January 1978, in which Klein is said to have thanked Havlir was an issue of fact disputed between the parties. I find it unnecessary to resolve this dispute, since sufficient additional evidence both direct and circumstantial leads me to conclude that buyers directed to J & C Ferrara were diverted by the similarity of name, into the Ferrara Creations showroom.

Donald Tatro, a wholesale jewelry salesman who has been acquainted with Carl Ferrara for ten years, and who often recommends J & C Ferrara to buyers, testified to having directed Gail Lebert, a buyer for Sage-Allen department store in Hartford, to J & C Ferrara during the first week of June 1978. Ms. Lebert never reached the J & C Ferrara showroom, but did visit the Ferrara Creations showroom during the same period of time and made purchases of Ferrara Creations merchandise for her store. This fact was corroborated by the testimony of Ferrara Creations Sales Manager, Larry Klein.

I find that the opportunity for confusion among buyers did exist, and that it resulted in the misdirection of individuals from J & C Ferrara to Ferrara Creations.

The fact that Ferrara Creations has itself listed in the lobby directory at 366 Fifth Avenue as "Ferrara, Inc.," is highly suspect. Larry Klein's testimony to the effect that he had been informed by a building employee that there wasn't enough room on the sign for the full company name, and that he did not over a period of many months notice that the sign had not been changed in accordance with his wishes is unworthy of belief. Reference to PX 103 makes it clear that the full corporate name easily could have been accommodated within the space provided on the sign. Larry Klein passed the directory countless times on his way to and from the Ferrara Creations showroom, and could have checked whether or not the sign had been changed in accordance with his professed wishes. I am led to conclude that the directory was maintained in a false and misleading condition for the purpose of luring confused buyers into the Ferrara Creations showroom, and impinging even further on plaintiff's trade name.

Finally, actual confusion on the level of the retail purchaser was evidenced by the testimony of Ann Nocella. She testified to a shopping expedition during the week of August 21, 1978 with her daughter Carol Ann Smith to the Bamberger Department Store in Springfield, Pa. Ms. Nocella was familiar with J & C Ferrara, having purchased its jewelry for herself and her daughter on prior occasions. She found the jewelry to be of high quality and she recommended it to her daughter on this occasion. Her daughter purchased a ring with a Ferrara Creations tag on it, believing it to be a J & C Ferrara product. Ms. Nocella's knowledge of jewelry was somewhat greater than that of the average consumer, because she had been employed as a jewelry buyer. Yet she was sufficiently confused about the origin of the ring to recommend it to her daughter as being a product of J & C Ferrara. On August 26, 1978, Ms. Nocella telephoned J & C Ferrara, and was informed that the ring bought by her daughter was not one of its products. The ring was then returned to the store. On this occasion an informed consumer was deceived and misled as to the origin of a piece of retail merchandise which that consumer believed to be a product of J & C Ferrara, but which was in fact a product of Ferrara Creations.

The trade names "J & C Ferrara" and "Ferrara" are derived from Carl Ferrara's family name which has remained unchanged since birth, and which translated from the Italian means ironworker or blacksmith. Many Italian-American families share this surname and the related name, Ferraro. Numerous businesses of these names or variants are found in the Manhattan telephone book. Ferrara is also the name of a city in Italy, and of the province in which that city is located, neither of which are especially noted for jewelry manufacture.

Considerable sums totalling over $100,-000.00 have been expended by J & C Ferrara in an effort to develop its trade name. This advertising takes several forms. Since July, 1973, J & C Ferrara merchandise has been regularly advertised in the Jewelers' Circular Keystone, the most important and widely read trade magazine in the industry with a circulation of over 30,000 nationwide. The company has been listed every year since 1973 in the Jewelers' Circular Keystone Directory which is mailed annually to the trade magazine's subscribers. Other trade magazines in which J & C Ferrara has advertised are the National Jeweler, which is distributed nationwide, and the Pacific Goldsmith, which is distributed regionally on the west coast. J & C Ferrara retains an advertising agency, George D'Amico Advertising, Inc., through which it places these and other advertisements.

Another form of advertising used widely by J & C Ferrara is cooperative advertising in which it shares the cost of advertising with its customers. Such advertising has appeared in newspapers and magazines across the country. The newspapers include the New York Times, the Chicago

Tribune, the Spokane Chronicle, the Austin American Statesman and the New Orleans Times-Picayune. The magazines include Dutchess Life Magazine and Women's Wear Daily. Finally, J & C Ferrara engages in point of purchase advertising in the form of tags on its merchandise and brochures which often accompany its products.

In stark contrast to J & C Ferrara's substantial advertising effort, Ferrara Creations has done virtually no advertising. Ferrara Creations has done no advertising in trade journals or magazines. Cooperative advertising is not in any way funded by the company, but is placed on a voluntary basis among the twelve sales representatives who bring its goods to market. No evidence was introduced by defendant that it had engaged in advertising of any kind. Despite this dearth of advertising, the sales of Ferrara Creations have grown rapidly, leading to the inference that it is benefitting at least in part from the already established reputation of J & C Ferrara.

Conflicting evidence was presented to the Court with respect to the knowledge which Ferrara Creations had of the previous use being made of the name Ferrara in the wholesale jewelry business. Larry Klein testified as to the origin of the name Ferrara Creations. In May 1977, he says, he was sitting in his apartment with a friend Roark St. Romain. Also present in the apartment was a map of Italy earlier purchased by Mr. Klein with a view towards finding an "Italian sounding" name for the new jewelry concern by which Mr. Klein was to be employed. Klein testified that he was sitting there in his apartment while his friend looked at the map of Italy, and that it was St. Romain who suggested the name Ferrara. The name was then suggested to Abraham Stefansky and Ernest Katz, who liked it and adopted it as the name for their new corporation. Klein testified that during his ten years experience in the business he had neither heard nor seen the name J & C Ferrara. However, Klein did admit to having been an occasional reader of the Jewelers' Circular Keystone Magazine in which J & C Ferrara regularly had advertisements. Had Mr. Klein wanted to check whether the name Ferrara was already being used in bridge jewelry he could easily have done so.

As it happened, Klein received actual knowledge of the existence of J & C Ferrara in July 1977 in a conversation with a buyer for Allied Stores named Ellen Ball. Under agency principles the knowledge of an employee such as Mr. Klein must be attributed to the corporation. When Klein became sales manager of the Second Ferrara Creations corporation in December 1977, his knowledge of the existence of J & C Ferrara became attributable to Ferrara Creations, Inc.

Milton Tupler, a sales representative of Ferrara Creations became aware of the existence of J & C Ferrara in February 1978, by reading its name in the directory to the Retail Jeweler's Show at which he was in attendance. He testified that he related this information to Larry Klein who acknowledged the existence of the firm.

After reading a news article about Ferrara Creations in the Fashion Jewelry Review magazine in May 1978, Carl Ferrara made a phonecall to the Ferrara Creations showroom. A man answered the telephone. It must be concluded that the man was Larry Klein since the only other person then employed at the showroom was a woman. Carl Ferrara asked to speak with "Mr. Ferrara," and was informed that there was no Mr. Ferrara, after which he was asked by Mr. Klein to identify himself, to which he responded that he was Carl Ferrara of J & C Ferrara company. Carl Ferrara then asked Mr. Klein how Ferrara Creations got its name, and Klein responded, falsely, that one of the firm's designers came from Ferrara, Italy. When asked by Carl Ferrara who the firm's principal was, Klein told him that it was Leon Scharf. Carl Ferrara ended the conversation by telling Larry Klein that he should inform Leon Scharf that he would be hearing from J & C Ferrara's attorney.

I find that when Leon Scharf requested his attorney to register the Ferrara Creations trademark in May 1978 that he did so

with actual and constructive knowledge of the existence of a prior use of the similar trademark J & C Ferrara. Ferrara Creations received a demand letter from J & C Ferrara's attorneys dated July 17, 1978 shortly before its trademark was officially filed on July 31, 1978 with the office of the Secretary of State of New York. At the time this attorney's letter was received, Ferrara Creations already had knowledge of the prior use of the J & C Ferrara tradename.

Another factual issue which was contested between the parties had to do with whether or not the word "Ferrara" was commonly used within the business to refer to J & C Ferrara. This is important in that it relates directly to the issue of similarity, and also relates to the issue of likelihood of confusion between the marks. I find that the single word "Ferrara" is and was commonly used to refer to J & C Ferrara and that it was also used to refer to Ferrara Creations. Common sense dictates such a finding, but there is also ample evidence in the record to support this conclusion. It is common for persons in any business to adopt a shorthand terminology reflected in the language used by them in carrying out their day to day affairs. The wholesale jewelry business is no exception to this common practice. Plaintiff's witnesses, Havlir and Tatro, and the plaintiff Carl Ferrara all testified to the practice of referring to J & C Ferrara as simply "Ferrara." Documentary evidence in the form of magazine articles and advertisements confirmed the use of the shorter "Ferrara" for J & C Ferrara. Defendant's witness, Ronald Klosowski, testified that he and others commonly refer to Ferrara Creations as "Ferrara." That the practice extended to buyers is evidenced by the purchase order form from Tiche's department store which referred to defendant as "Ferrara" (PX 94A). It was common for those in the industry, in their business dealings with each of the firms as well as in their regular parlance, to use the single word Ferrara instead of reciting the full corporate names of the respective concerns.

■ Plaintiffs seek protection for two unregistered, common-law trademarks used by them in the wholesale jewelry business. It is not a prerequisite that the marks be registered in order for them to be protected under the Lanham Act. It suffices if the mark said to be infringing is likely to cause confusion or to deceive purchasers as to the origin of the goods. *Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288 (S.D.N.Y. 1972) (Gurfein, J.); *Apollo Distributing Co. v. Apollo Imports Inc.,* 341 F.Supp. 455 (S.D.N.Y.1972) (Weinfeld, J.).

■ Whether the tradenames "J & C Ferrara" and "Ferrara" can be protected under the federal statute depends upon whether they have obtained a secondary meaning in the minds of the consuming public, and those with whom the firms regularly deal. If such secondary meaning can be demonstrated, then the tradenames must be protected in the public interest to avoid confusion among consumers as to the source of merchandise. It matters not that the tradenames in question happen to be based upon an Italian surname. It was held in *Scarves by Vera, Inc. v. Todo Imports Ltd., Inc.,* 544 F.2d 1167 (2d Cir. 1976) that the fact that the name "Vera," the first name of a well-known designer, Mrs. Vera Neumann, was a common name would not prevent it from being protected as a trademark where secondary meaning for the trademark was demonstrated.

■ Secondary meaning was defined in *Safeway Stores, Inc. v. Safeway Properties, Inc.,* 307 F.2d 495, 499 (2d Cir. 1962):

"If because of association with a particular product or firm over a period of time a word has come to stand in the minds of the public as a name or identification for that product or firm, the word is said to have acquired a secondary meaning."

The standard of proof to be used in determining whether a name has acquired a secondary meaning is that used in *W. E. Bassett Company v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir. 1970). In order to establish secondary meaning it must be proven "more likely than not" that the tradename has such effect even if merely subconscious, upon the mind of the consumer.

■ Plaintiff has presented adequate evidence of secondary meaning to establish the right of its tradenames to protection under the Lanham Act. J & C Ferrara occupied the wholesale jewelry market, specifically the "bridge business" sector, for at least five years previous to the establishment of Ferrara Creations. It has expended large sums, relative to its size, for the purpose of advertising its tradename, and the advertising budget of the company continues to grow. J & C Ferrara markets its products nationwide and services over 3,000 accounts. It has made substantial sales every year since its inception, and expects to realize sales of $2,000,000.00 in the current fiscal year.

It is noteworthy that where there was misdirection of mail between the two entities, it occurred in the direction of J & C Ferrara rather than Ferrara Creations, leading to the conclusion that the name Ferrara had become associated with the firm of J & C Ferrara in the minds of customers.

■ Other factors which must be considered in determining whether there is a likelihood of confusion between the marks of plaintiff and defendant so as to warrant the protection of plaintiff's mark under the Lanham Act are the degree of similarity between the marks, the degree of similarity between the products, the competitive proximity of the products, the degree of care likely to be exercised by consumers, and any showing of actual confusion. *Menley & James Lab. v. Approved Pharm. Corp.,* 438 F.Supp. 1061 (N.D.N.Y.1977) (Munson, J.).

There can be no doubt that the marks here in question are similar. The tradenames J & C Ferrara and Ferrara Creations are similar upon their face. Evidence presented established that both of the entities were commonly and customarily referred to as "Ferrara" by those within the wholesale jewelry business.

The products marketed by the two entities are also similar. Both companies manufacture and are wholesale distributors of jewelry in the price range of $10.00 to $100.00. It is not significant that Ferrara Creations restricts itself to the sale of 14-karat gold items exclusively, since J & C Ferrara has from its inception sold 14-karat gold jewelry in addition to its sales of sterling silver and gold filled merchandise. Also, the percentage of J & C Ferrara's sales made up of 14-karat gold jewelry continues to increase.

In its recent opinion in *American Home Products Corporation and Boyle-Midway, Inc. v. Johnson Chemical Co., Inc.,* 589 F.2d 103 (2d Cir. 1978), the Court of Appeals held at p. 107:

> "[O]ne who adopts the mark of another for similar goods acts at his own peril and any doubt concerning the similarity of the marks must be resolved against him. *United States Time Corp. v. Tennenbaum,* 267 F.2d 327 (C.C.P.A.1959)."

The jewelry sold by Ferrara Creations is similar to that sold by J & C Ferrara. Therefore we are bound to conclude that the mark "Ferrara Creations Artisans in 14-karat gold" is similar to J & C Ferrara, even if such similarity were not obvious, which I believe it to be.

Furthermore, there is competitive proximity of a substantial nature between the two companies. Although J & C Ferrara sells to far more retail jewelry stores than Ferrara Creations, both entities are actively engaged in soliciting business from retail department stores. Evidence was introduced at trial which demonstrated that the two firms had department store customers in common. The merchandise which the companies seek to sell the department stores is similar in nature.

With regard to the degree of care likely to be exercised by consumers in the purchase of jewelry marketed by these concerns, I find that consumers are not likely to exercise great care in the purchase of merchandise of this nature. A consumer exercising the ordinary care expected under the circumstances would not be able to discern the difference in origin between the product produced by J & C Ferrara and that of Ferrara Creations. Even an informed consumer such as the witness Ann

Nocella was deceived into believing that Ferrara Creations merchandise originated with the plaintiff J & C Ferrara.

■ It is not necessary, under the holding in *Maternally Yours v. Your Maternity Shop,* 234 F.2d 538 (2d Cir. 1956) that plaintiff present evidence of actual instances of confusion as a result of the similarity of its tradename with that of defendant in order for the Court to grant injunctive relief under the Lanham Act. However, plaintiff has presented to the Court substantial testimonial and documentary evidence of actual confusion having occurred between the plaintiff and the defendant as a result of the similarity of their tradenames. As was said in *Polo Fashions, Inc. v. Extra Spec. Prod., Inc.;* 451 F.Supp. 555, 561 (S.D.N.Y. 1978) (Goettel, J.), "the presence of actual confusion is perhaps the strongest evidence of the likelihood of confusion." Actual confusion was demonstrated by plaintiff on both the wholesale and retail levels. Several buyers were confused enough by the similarity of the names of the two companies so as to misdirect orders, credit claims and even merchandise. As was pointed out in *Polo Fashions, supra,* such confusion among distributors while not direct evidence of confusion among the purchasing public, can support the inference that confusion exists at that level as well. But where in addition there is evidence presented of actual confusion occurring on the retail purchaser level as it was here, the conclusion is inescapable that defendant's similar tradename has caused and will continue to cause confusion unless appropriate injunctive relief is granted to plaintiff.

■ Finally, with regard to the knowledge of prior use which may be imputed to the defendant, I find that the record supports the conclusion that Ferrara Creations was apprised of the existence of a competitor in the wholesale jewelry business from the time of its inception in December 1977. Having knowledge of this prior use, defendant proceeded at its own risk to use a confusingly similar tradename in the sale of its products. Whether or not it did so with the intent to mislead the public as to the origin of its goods, it is clear from the evidence that the use did have the effect of misleading buyers, suppliers and consumers in a manner impermissible under the Lanham Act.

I find that the defendant Ferrara Creations has engaged in misrepresentations and false descriptions as to the origins of its goods in interstate commerce, in violation of 15 U.S.C. § 1125(a), and that the plaintiff J & C Ferrara is entitled to injunctive relief as detailed below.

Turning to the claim for relief made by plaintiffs under § 368–d of the New York State General Business Law, over which this Court has pendent jurisdiction, I find that this claim has merit and plaintiffs may be afforded relief based upon this statute.

■ The relief against unfair competition provided under the New York statute is not limited to those situations where the plaintiff establishes secondary meaning for its tradename. Rather, the statute affords relief in order that business values developed by the skill and expenditures of a competitor may not be unfairly misappropriated, whether or not the plaintiff has yet established a secondary meaning in the marketplace. The controlling question in such cases is whether the defendant has acted fairly or unfairly, according to principles recognized in equity. See *Flexitized, Inc. v. National Flexitized Corporation,* 335 F.2d 774 (2d Cir. 1964); *Mortellito, supra; Menley & James Lab., supra.*

■ I find that defendant acted unfairly in adopting a tradename so similar to that of plaintiff that it was likely to cause and did actually cause confusion between the two companies in the wholesale jewelry business. In so doing, defendant took unfair advantage of the business values developed by plaintiff through the application of its business acumen and the expenditure of considerable time, money and effort. The equities are clearly in plaintiff's favor. Ferrara Creations acted with knowledge of the prior use, and in doing so acted at its own risk. It has not expended large amounts on advertising, but has traded on

the already established tradename of J & C Ferrara.

Therefore, plaintiffs have established their right to relief under both the Lanham Act and the General Business Law of the State of New York.

I find that the continued use by the defendant of their tradename will cause irreparable injury to plaintiff's business. Therefore, defendants Ferrara Creations, Inc. and Larry Klein and all their agents, servants, employees, business representatives, their successors and assigns and others having notice shall be permanently enjoined from using the word "Ferrara," or any other name or mark similar to the name "J & C Ferrara," or any combination of words containing the word "Ferrara" in connection with the wholesale jewelry business anywhere in the United States. Defendants shall be enjoined to change the name of the defendant corporation so as not to include the name "Ferrara" or any name similar to "J & C Ferrara", and to cancel any state or federal registrations.

No other relief is appropriate. Plaintiffs did not present adequate evidence to support a claim for an accounting as to profits lost as a result of the diversion of business from J & C Ferrara to Ferrara Creations.

As part of its merchandising methods, defendant places in various department stores racks, cases and other displays which belong to it. These items, collectively "displays," are rust colored, with gold embossed references to "Ferrara" prominently displayed thereon. To balance the equities between the parties and to avoid undue dislocation of the trade, and undue inconvenience to the retailers using defendant's displays, the final judgment to be submitted shall stay its applicability to displays, and goods actually now within the channels of commerce, for a period of sixty (60) days.

The foregoing constitutes findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

Settle a final Judgment on ten (10) days notice.