**D C COMICS, INC., Plaintiff,**

v.

**Jerry POWERS, Michael Barkow, the Daily Planet, Inc., and Future Development Merchandising, Inc., Defendants.**

No. 78 Civ. 4597 (KTD).

United States District Court,
S. D. New York.

Dec. 7, 1978.

Weiss, David, Fruss & Lehrman, New York City, Cowan, Liebowitz & Latman, New York City, for plaintiff; Michael Davis, New York City, Carol F. Simkin, Mitchell Alan Frank, New York City, of counsel.

David S. Fitzpatrick, Michael F. Schwartz, New York City, for defendants Jerry Powers and The Daily Planet, Inc.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge:

This is a trademark action involving use of the name Daily Planet both as the title of a news publication and in connection with a myriad of consumer products. Plaintiff, D C Comics, Inc., charges that the continued use of the name Daily Planet by defendants, the Daily Planet, Inc. and its President, Jerry Powers,[1] is violative of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), [hereinafter "the Act"] and constitutes unfair competition resulting in dilution of plaintiff's common law trademark under the law of New York. Jurisdiction is founded upon 28 U.S.C. § 1338(a), (b) and upon the principles of pendent jurisdiction.

In June of 1938, plaintiff's predecessors created the fictional character called Superman—the "man of steel who, with powers and abilities beyond those of mortal men, fights a never ending battle for truth, justice and the American way." The Daily Planet serves a dual function in relation to the Superman character. Primarily, it is the name of the fictitious Metropolis newspaper which employs Superman's alter ego, together with the other central characters in the Superman story. The Daily Planet is also the title of a promotional news column appearing from time-to-time within Superman comic books.

Defendants are the moving forces behind an underground news publication[2] called the Daily Planet. The Daily Planet appeared between the years 1969 through 1973. Since its demise in 1973, the Daily Planet lay dormant until recently when defendants demonstrated a great interest in its resuscitation.

Upon commencement of the instant action, defendants moved for a preliminary injunction to preclude plaintiff from any use of the name Daily Planet including the advertisement, promotion, distribution or

---

**1.** The complaint also names Michael Barkow and Future Development Merchandising, Inc. as defendants. Mr. Barkow, a former employee of Future Development Merchandising, Inc., notified the Court that it was his belief he was not a proper party to this action and has decided not to make an appearance in the action. Similarly, Future Development has not entered an appearance.

Suffice it to say, that these parties have not been named in the motions for preliminary relief now before me and are unnecessary for the determination thereof.

**2.** Defendants classify their news publication as an "alternate culture" publication which focused primarily upon the socioeconomic and political problems of the "crisis-worn era of the late sixties and early seventies." Defendants' Memorandum of Law at 3.

sale of any products in connection with the multi-million dollar cinema production of "Superman", scheduled to be released in just a few weeks by plaintiff's parent, Warner Communications.[3] Plaintiff has cross moved for injunctive relief seeking to preclude defendants from any use of the Daily Planet.

A hearing was held before me on November 21st and 27th. The following, based upon the testimony elicited and the evidence received at the hearing together with the memoranda and affidavits submitted by the parties, constitute my findings of fact and conclusions of law.

Both plaintiff and defendants claim that as a result of a prior appropriation and use of the name Daily Planet, they each possess exclusive rights to its use. What is really at issue, however, is whether either party to this action is entitled to exclusive exploitation of the name Daily Planet based on the expected wave of public interest in the Superman character calculated to result from the release of the Superman movie.

■ It is well settled that a preliminary injunction will issue only upon a clear showing by the movant that it will suffer irreparable harm absent its issuance and demonstrates either (i) a probability of success on the merits, or (ii) sufficiently serious question going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the movant. See, e. g., Triebwasser & Katz v. American Telephone & Telegraph Co., 535 F.2d 1356 (2d Cir. 1976).

Merits of the Case

■ It is undisputed that neither plaintiff nor defendants presently hold a registered trademark in the Daily Planet and, therefore, any rights to the exclusive use thereof are to be determined solely under the common law of trademarks. D. M. & Antique Import Corp. v. Royal Saxe Corp., 311 F.Supp. 1261, 1271 (S.D.N.Y.1970).

■ A common law trademark, paralleling its statutory counterpart, includes any word, name or symbol adopted and used by a manufacturer or merchant to identify his goods and to distinguish them from those manufactured or sold by others. 3 Callmann, Unfair Competition Trademarks and Monopolies § 65 at 1–2 (3d ed. 1969). See also Clairol, Inc. v. Gillette Co., 270 F.Supp. 371, 376 (E.D.N.Y.1967), aff'd 389 F.2d 264 (2d Cir. 1968).

■ The function of a trademark is to identify the source of a product. Indeed, it has been held that:

. . . protection of trademarks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942).

In order to claim ownership of a mark, a party must demonstrate that his use of the mark has been of such a quality and for such a duration that it has come to identify goods bearing it as originating from that party. In short, the mark must have developed a secondary meaning—the primary significance of the mark in the hands of the consuming public is not to identify the product, but rather, to identify its producer.

■ In order to succeed in its suit claiming infringement, plaintiff must establish three essential elements: plaintiff is the owner of the mark; the mark indicates the source of the goods; and, defendant's use of the mark is likely to create confusion in the minds of the consuming public as to the source of the goods. See generally 3 Callmann, Unfair Competition Trademarks and Monopolies §§ 65–66 (3d ed. 1969).

Likewise, defendants, to succeed in their claim of exclusive ownership of the Daily Planet, must prove these same elements.

The Superman character has, since its creation in 1938, been featured in comic books, comic strips and on radio and televi-

---

**3.** Warner Communications has not been made a party to the instant action and, therefore, defendants' motion for injunctive relief reaches only plaintiff's use of the Daily Planet.

sion. The Daily Planet first appeared in the Superman story in 1940. Since then, the Daily Planet has played a key role, not only in the Superman story, but also in the development of the Superman character. In addition, plaintiff has gone to great effort and expense throughout the long history of Superman to utilize the Superman character in connection with a myriad of products born of the Superman story. See Defendants' Exhibit U. Indeed, to this end plaintiff employed the Licensing Corporation of America to act as its agent in the licensing of the Superman character to persons wishing to use it in connection with a given product. These products have included school supplies, toys, costumes, games and clothes.

At the hearing before me, Joseph Grant, the President of the Licensing Corporation of America, explained the licensing procedures for the D C Comics, Inc. and in particular the Superman characters. He testified that his corporation, at the behest of D C Comics, Inc., licenses the Superman story as a package. Thus, the typical licensing agreement would permit use not only of Superman, but of all the Superman characters. Mr. Grant concluded that while the Daily Planet was never singled out in any licensing agreement, he believed it to be part and parcel of the typical licensing agreement. Indeed, it was clearly established that the Daily Planet has been prominently featured on many products emanating from these licensing agreements.[4] *See, e. g.,* Plaintiff's Exhibit 3; Defendants' Exhibit X.

In contrast, defendants' relationship with the term Daily Planet has been both brief and, at best, sporadic. Defendants' first published their newspaper in 1969 in Miami, Florida and called it "The Miami Free Press." Thereafter, the name went through a series of changes from "The Miami Free Press and The Daily Planet", to "The Daily Planet and The Miami Free

Press" and finally to "The Daily Planet." In 1970, Powers registered the name Daily Planet as the trademark for the paper. It was also during this period that Powers caused the incorporation of the Daily Planet, Inc.

There was testimony from the defendant Powers that the Daily Planet was distributed at the Woodstock Music Festival in Woodstock, New York and at the Atlanta Pop Festival in Georgia. I am willing to believe that to be true. Much of Power's other testimony, however, strains credibility.

Despite defendants' dream of creating a paper with national appeal, the Daily Planet remained throughout its brief history essentially a local affair and, as such, was published between 1969 through 1973 on an irregular basis. Powers also testified that from its inception, the Daily Planet was plagued with financial problems. Finally, in 1973, its financial woes became overwhelming and the paper folded.

Thereafter, Powers left Florida and began work on a new underground publication called "Superstar." At least two issues of "Superstar" were published at this time. It appears that the majority of defendants' time and efforts were devoted to the promotion of this new publication. Consequently, defendants permitted their trademark registration of Daily Planet to lapse and it was subsequently cancelled by the Office of Patent and Trademark Registration in 1976.

In light of the foregoing, it is apparent that only plaintiff has demonstrated an association of such duration and consistency with the Daily Planet sufficient to establish a common law trademark therein. The totality of evidence demonstrates that the Daily Planet has over the years become inextricably woven into the fabric of the Superman story.

---

4. Plaintiff's interest in the news column contained in the Superman comics, however, is not as firmly established. The column first appeared in 1966. It was presented in only one issue at that time. Thereafter, the second publication of the Daily Planet column appeared in one issue in 1970. It has only been in the past three years that it has become a regular feature in the Superman comics.

Defendants, on the other hand, have offered very little to evidence either a substantial or genuine interest in the Daily Planet. More importantly, however, upon the demise of the Daily Planet in 1973, I find that defendants engaged in a course of conduct evidencing an intent to abandon any interests they may have acquired therein. The fact that defendants permitted their registration of the Daily Planet to lapse and thereafter began to publish another paper of the same nature as the Daily Planet under the name "Superstar" is dispositive of this intent and supports a finding of abandonment.

■ Turning in particular to plaintiff's claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), it is not a prerequisite for remedial action thereunder that the mark in issue be registered. *Rare Earth, Inc. v. Hoorelbeke,* 401 F.Supp. 26, 37 (S.D. N.Y.1975); *Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288, 1294 (S.D.N.Y.1972). Consequently, under this section, a common law trademark is entitled to the same protection as its statutory counterpart. A plaintiff, therefore, is entitled to remedial action under this section if the defendant has affixed plaintiff's mark to his goods in such a fashion as to misrepresent to the public the source of the goods.

■ Although it is imperative in the instant action for plaintiff to demonstrate that defendants' use of the Daily Planet is likely to either confuse or deceive purchasers as to the source of items bearing the mark, *Mortellito v. Nina of California, Inc., supra,* 335 F.Supp. at 1295, liability will attach even though plaintiff is not in direct competition with the defendants.[5] *Id.*

■ There is no mathematical formula by which to measure the likelihood of confusion or deception as contemplated under section 43 of the Act. It is settled, however, that proof of actual confusion is generally not required where the party seeks only preliminary equitable relief. *Clairol, Inc. v. Gillette Co.,* 270 F.Supp. 371,

379 (E.D.N.Y.1967); 3 Callmann, Unfair Competition Trademarks and Monopolies § 80.6 at 557–58, 561–62 (3d ed. 1969). Moreover, it has been held that where the evidence demonstrates "that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built-up, then the inference of [the] likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit." *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 158 (9th Cir.), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963) (citations omitted). Indeed, where such an intent to deceive the public has been demonstrated, it gives rise to a presumption that deception and confusion in fact resulted. *Mortellito v. Nina of California, Inc., supra,* 335 F.Supp. at 1295.

■ Applying these principles to the case at bar, it is evident that plaintiff has demonstrated a probability of success on the merits sufficient to warrant the equitable relief requested.

As previously noted, plaintiff has, through the Licensing Corporation of America, engaged in extensive licensing of the Superman character as well as the Superman story covering a myriad of products. See Defendants' Exhibit U. From the numerous exhibits presented and the testimony elicited, it is clear that the Daily Planet has played a key role in many of these licensing agreements. Despite the fact that the Daily Planet has never individually been the subject of one of these agreements, it has been prominently displayed on many of the products emanating from these agreements. *See, e. g.,* Plaintiff's Exhibit 3. Furthermore, the Daily Planet has become so closely associated with the presentation of the Superman story that any use thereof by defendants would create a substantial likelihood of con-

---

5. Accordingly, the fact that plaintiff never published an actual paper entitled the Daily Planet is neither a barrier to the instant suit nor to preliminary equitable relief.

fusion at the consumer level. See Exhibits A and B to the Goldman Affidavit.[6]

Moreover, in the case at bar, I find substantial evidence indicating that the adoption by defendants of the name Daily Planet in 1969 was merely an attempt to cash in on the Superman story and its notoriety. Powers admitted that he was aware of the relationship between the Daily Planet and the Superman story when he first decided to use the name. Powers' Affidavit at 113. It was also established that there were, throughout the brief history of Powers' Daily Planet, numerous references in the paper not only to the Superman character, but also to the Superman story, for example:

(i) A lead article entitled "Superman smokes super dope";

(ii) A promotional campaign to encourage new subscriptions employing the phrase "Join the Planet Army in Metropolis"[7];

(iii) Use of the phrase "Watchdog of Metropolis" as its slogan;

(iv) Numerous drawings of the Superman character;

(v) Use of a masthead which was an exact replica of the Daily Planet insignia appearing in numerous Superman comic books. (Compare Plaintiff's Exhibit 6 C, E, and L with Defendants' Exhibit A (issues dated October 3, 1970, July 20, 1970 and July 6, 1970)).

Thus, it is quite apparent that defendants, both in adopting the Daily Planet as the title of their newspaper and in its publication, intended to at least confuse, if not to deceive the public as to the origin of the publication.

Defendants made much of plaintiff's failure to diligently police its mark during the period defendants were publishing and distributing their version of the Daily Planet. They premise their argument, at least in part, on the fact that during its brief history, the Daily Planet ran over 50-full page advertisements for plaintiff's corporate parent Warner Communications. Defendants conclude that this put plaintiff on notice of their use of the Daily Planet and under the doctrine of laches, plaintiff is precluded from the equitable relief sought in this action. I disagree.

Even assuming, *arguendo*, that the knowledge of persons at Warner Communications could be imputed to the plaintiff[8] and establish the necessary elements for laches, it cannot be asserted by the defendants herein. Indeed, as stated above, there is substantial evidence on the record before me tending to prove that defendants' use of the Daily Planet was, *ab initio*, part of a scheme to trade on the good will and business reputation that plaintiff (and its predecessor) had built around the Superman story. In short, defendants have unclean hands and have had such from their first use of the name Daily Planet. Thus, under the settled principles of equity defendants may not prosper from their own wrongdoing and are precluded from asserting the defense of laches.

Moreover, while plaintiff may have been somewhat less than diligent in policing its

---

6. Shepard Goldman has been an employee of the Callahan Research Association for the past two years. As such, he has conducted many "consumer surveys" calculated to measure consumer awareness on one subject or another. He personally conducted a "consumer survey" calculated to measure the "awareness of the name Daily Planet." The overwhelming response indicates an association of the Daily Planet with the Superman character.

While I do not construe this survey as dispositive of a likelihood of confusion at the consumer level concerning the Daily Planet, it is some evidence of such confusion.

7. Metropolis is "the resident city of Superman and the scene of the vast majority of his adventures." See The Great Superman Book, The Complete Encyclopedia of the Folk Hero of America, at 223. (Plaintiff's Exhibit 14 herein).

8. It is extremely doubtful that notice to Warner Communications can be imputed to plaintiff for purposes of invoking the doctrine of laches. Before a parent's knowledge will be imputed to its subsidiary, it must be shown that the parent's employees informed of the infringement were under a duty to report that information to the subsidiary. *See Dawn Donut Co., Inc. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959).

mark, in light of the local appeal and limited distribution (geographic and numeric) of defendants' publication, I am not convinced that their lack of diligence was so great as to warrant loss of their trademark.

In light of the foregoing, the defendants' continued use of the Daily Planet is likely to cause irreparable injury to plaintiff's business reputation, good will and to its common law trademark.

Accordingly, defendants' motion for preliminary relief is denied and plaintiff's motion for a preliminary injunction is granted.

So ordered.