Baldev DUGGAL, et al., Plaintiffs,

v.

Sundaram Rama KRISHNA, et al., Defendants.

Civ. A. No. 82–2956.

United States District Court, District of Columbia.

Jan. 11, 1983.

**1044**

Jerald ,A. Jacobs, Glenn P. Sagameli, Washington, D.C., for plaintiffs.

Stephen D. Graeff, Washington, D.C., for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

One year ago plaintiff Baldev Duggal and defendant Sundaram Rama Krishna marketed a pilot issue of *Courier Diplomatique,* a monthly magazine directed at the international diplomatic community. Now, their association having soured after release of the May 1982, issue, the former colleagues are before the Court on plaintiffs' motion for a preliminary injunction on claims of trademark infringement and unfair competition.

Since July 1982, Krishna and his new company have published several issues of the magazine,[1] still calling it *Courier Diplomatique,* without the participation of Duggal or the three corporate plaintiffs of which Duggal is the real party in interest.[2]

1. Krishna's pleadings allege that five issues have been published since July but the exhibits contain the covers of only three.

2. This was made possible by Duggal's being situated in New York while Krishna worked out of an office in Washington, D.C.

Duggal wishes the Court to enjoin this continued publication. At a hearing he stated that should the magazine be returned to him by means of a preliminary injunction he would be willing to place its income in escrow pending final determination of this case. Defendant Krishna declined to make such an offer.

The parties make a number of claims and counterclaims alleging fraud, conversion, breach of contract, breach of fiduciary duty and more. These allegations are largely irrelevant to the Court's present task, which is to determine whether plaintiffs are likely to prevail on their trademark infringement and unfair competition claims, and will suffer irreparable injury pending resolution of those claims, such that a preliminary injunction should issue. After careful consideration of the parties' pleadings, affidavits, exhibits and the testimony given at the hearing,[3] the Court finds that plaintiffs have met their burden. The escrow provision will be insisted upon, however, because it is the surest way to preserve the *status quo* pending resolution of all the issues. This memorandum constitutes the Court's findings of fact and conclusions of law.

Duggal would be entitled to prevail under the common law and Lanham Act, 15 U.S.C. § 1116 *et seq.,* "if the defendant has affixed plaintiff's mark to his goods in such a fashion as to misrepresent to the public the source of the goods." *D C Comics, Inc. v. Powers,* 465 F.Supp. 843, 848 (S.D.N.Y. 1978). Thus to succeed on the merits Duggal must establish three elements: that he owns the trademark *Courier Diplomatique,* that the trademark indicates the source of the magazine ("secondary meaning"), and that Krishna's use of the mark is likely to create confusion as to the magazine's source. *Id.*[4]

3. Plaintiffs produced two witnesses: Duggal and his former lawyer. Defense counsel called no witnesses (although Krishna was seated at counsel's table) referring the Court to Krishna's affidavit filed with defendants' pleadings.

4. Neither party holds a registered trademark (each has filed an application) so that the trademark infringement claim is governed by

As to ownership, it is undisputed that Duggal was publisher and Krishna was editor of a magazine called *Courier Diplomatique* from January 1982 through May 1982. Krishna claims, however, that the November 1981 pilot issue of *Courier Diplomatique* was his sole venture, not a joint effort by Krishna and Duggal, and that Duggal bought into the magazine only at the end of the year as evidenced by a written contract between the parties dated December 29, 1981. Defense counsel maintained that because Krishna conceived of the magazine and its name and first published it, he, not Duggal, is the rightful owner of the trade mark "Courier Diplomatique." The Court does not decide whether these facts would make Krishna owner of the mark because it finds that the facts are otherwise: Krishna was not the first user of the mark, even though the name "Courier Diplomatique" appears to have been his idea. Rather, by the time the November 1981 issue appeared, that is, before the magazine was placed in commerce, Krishna and Duggal had agreed to publish the magazine in tandem.

Although the earliest writing between the parties is the two-page contract, in the form of a letter, dated December 29, 1981, Duggal testified at the hearing that the document merely put in writing terms that had been agreed upon orally in October. Krishna does not dispute that he flew from Washington, D.C. to New York City in October to show Duggal his "mock-ups" and seek financial backing. Duggal testified that he was "very excited" by Krishna's proposition, that the two "shook hands" on a joint venture, that they spoke frequently on the telephone ironing out details and that near the end of October Krishna flew back to New York to finalize the association. That Krishna and Duggal met in October was corroborated by Duggal's lawyer, Marty Engler, who testified that he attended a meeting in October at which Krishna was presented to him as Duggal's co-venturer. The existence of a joint venture as early as October is also substantiated by three pieces of circumstantial evidence that do not suffer from the conflict of interest for which Engler's testimony could be faulted. First, Duggal obtained a certificate of incorporation, on October 23, 1981, for a company called Courier Diplomatique, Inc. This is consistent with Duggal's testimony that one of the matters on which he and Krishna "shook hands" was Duggal's pledge to form the corporate entity that would own and publish the magazine. It is improbable that Duggal would have gone to the trouble of forming a corporation, using a name suggested by Krishna, unless he had some basis for believing that he and Krishna were going to work together. Second, the opening sentences of the December 29 contract use language best explained as referring to an oral contract made in the past:

> This letter is intended to confirm the basic elements of our agreement regarding Courier Diplomatique. We have agreed as follows.

Finally, it was uncontroverted that the printer declined to pay for the publication of the November 1981 issue until Duggal guaranteed payment in writing. Duggal did pay at least $2,500 toward the printing costs.

Defense counsel made much of the absence of Duggal's own name on the November masthead, while Krishna's name appears as editor, and while Courier Diplomatique is listed with a Washington, D.C. address. This was satisfactorily explained by Duggal. He testified that as a successful businessman in the photographic processing business, with clients such as *Vogue* and *Glamour* and contacts with individual photographers and other photographic processing companies, he was reluctant to affix his name to a pilot issue of uncertain quality. Duggal testified that after the November 1981 issue was released he undertook to improve the magazine's appearance. He hired a graphics designer to modify the logo

the common law. The Lanham Act's proscription of unfair competition, 15 U.S.C. § 1125(a) is available to the owner of an unregistered mark, however.

and altered the title page. A comparison of the November and January issues supports this testimony; the January cover's photograph is crisper and the lettering is more professional. Duggal's name appears on the January 1982 issue as publisher; the name Courier Diplomatique, Inc. also appears, with both the Washington address and Duggal's New York address; and Duggal signed a three-paragraph message to readers. This format continued until May.

■ Because stock certificates were never issued, there is some question whether Courier Diplomatique, Inc. is a bona fide corporation under New York law. In deciding a trademark case, a court may look beyond the formalities of state business laws in an appropriate case. See, *e.g., Five Platters, Inc. v. Purdie,* 419 F.Supp. 372, 383 (D.Md.1976). It is not fatal to plaintiffs' case if there was a technical deficiency in the formation of Courier Diplomatique, Inc. The doctrine of equitable incorporation may come into play. Furthermore, Krishna may be estopped from denying that a joint venture—whether properly incorporated or not—existed between the parties. For at least six months he participated in holding out Courier Diplomatique, Inc. to the public as being a corporation, he drew salary from it, he accepted and even cashed checks made out to it, and he requested and accepted reimbursement for expenses from it.[5] In July, he apparently believed that he had become severed from the corporation, for he formed a separate company in the District of Columbia, called Courier Publications, Inc.,[6] and placed the new corporate name on the mastheads of the issues he published after the split with Duggal.[7] He

did not challenge the existence of Courier Diplomatique, Inc. until he was served with plaintiffs' complaint in October.

Duggal testified that Courier Diplomatique, Inc. was to be owned in equal shares by Duggal and Krishna. The absence of stock certificates makes this uncertain. For the purposes of deciding this motion, however, it is clear enough that Krishna was not the sole owner of an entity called Courier Diplomatique, Inc., Duggal was at least a part owner, if not the sole owner, and this joint ownership dates from the oral contract the parties made in October, in advance of the publication of the November 1981 issue. It is irrelevant for trademark purposes that Krishna first conceived of the magazine because the idea was turned into a product in commerce and made capable of bearing a trademark only by the joint efforts of Duggal and Krishna. See 3 Callman, Unfair Competition, Trademarks and Monopolies § 76.1 (3d ed. & 1981 supp.). Krishna agreed that the magazine was "to be published by the corporation." It is highly probable that the mark of the magazine would also be found to belong to the corporation, there being no indication of an agreement to the contrary. *Id.* Moreover, the fact that Krishna once may have been entitled to use the mark, when he was a co-venturer with Duggal, does not mean that he is forever entitled to use it. See, *e.g., Marshak v. Green,* 505 F.Supp. 1054 (S.D.N.Y.1981). Krishna cannot have it both ways. He cannot forsake all involvement with Courier Diplomatique, Inc. and his former associate but hold onto the corporation's primary asset, the trademark of "Courier Diplomatique" with a readership

---

**5.** Among the items for which Krishna sought and received reimbursement were a $308 laundry bill incurred while doing a story in Iceland, and a bill for over $1,000.00 worth of limousine service in Washington, D.C.

**6.** Krishna used the name Rama K. Sundaram on the incorporation papers.

**7.** The circumstances of the falling out are unclear. Duggal's pleadings maintain that one of his bookkeepers discovered by accident that

Krishna had personally cashed an advertiser's check made payable to Courier Diplomatique, Inc. This led to further investigation, according to the pleadings, and to dissolution of the association when Duggal asked Krishna for an explanation. There are other indications that the two men's association had not been a particularly congenial one for some time. It is not necessary to determine the facts surrounding the falling out for purposes of deciding this motion, and the Court declines to do so.

and advertising base established by the joint venture over a seven-month period.[8]

The second and third elements that plaintiffs must show are less problematic in this case and require only brief discussion. A mark has acquired a secondary meaning if it inspires an association in the minds of the relevant buying public between the name of the product and the product itself or its source. *American Association for the Advancement of Science v. Hearst Corp.,* 498 F.Supp. 244 (D.D.C.1980). Here the name of the magazine and the publishing company are identical, increasing the mark's effectiveness in linking the product to its source. Duggal testified that creditors are still sending bills to him and Courier Diplomatique, Inc. for debts incurred last spring. The testimony was uncontroverted and indicates that among creditors, at least, *Courier Diplomatique* has acquired a secondary meaning. Krishna may have been more familiar with the editorial side of the magazine, but editors, being employees of publishers, come and go and are not the "source" that a magazine trademark ordinarily indicates. Furthermore, it is relevant that Duggal has spent over $100,000 on *Courier Diplomatique* while Krishna invested only $18,000 in prospective advertising revenues because the amount of money spent on advertising and promotion is a factor to be weighed in determining whether secondary meaning exists. *Id.* at 257.

The testimony about creditors is also relevant to the issue of confusion. Although proof of actual confusion is not required when preliminary equitable relief is sought, 3 Callman § 80.6, Duggal's testimony indicated that defendants' use of the trademark has confused members of the relevant audience and it is likely to continue to do so. The bills from last spring are not being sent to Krishna's new company but to Courier Diplomatique, Inc. The cover and format of the magazine have not been changed since Krishna appropriated the magazine except that the word "Courier" has been moved to the left. Duggal testified that persons who know him still associate him with the magazine. This was uncontroverted. Furthermore, by Krishna's own admission, the double claims that are now being made of *Courier Diplomatique* advertisers— by Krishna and Duggal—are causing confusion among the advertisers. Finally, likelihood of confusion may also be shown by proof of wrongful intent on the part of the defendant. There are a number of indications of wrongful intent on the part of Krishna, beginning with his concealment of bankruptcy proceedings concerning himself and a former publication he edited, *Embassy News,* and ending with his virtual theft of the magazine from Duggal.

For the foregoing reasons it is likely that Duggal will succeed on the merits of both his trademark infringement and unfair competition claims. It is unlikely that Krishna could successfully assert the doctrine of unclean hands because the doctrine "may be relaxed if defendant has been guilty of misconduct that is more unconscionable than that committed by plaintiff." C. Wright & A. Miller, Federal Practice and Procedure § 2946. Defendants' assertion of laches has even less merit. Duggal never lulled the defendant into thinking that he had abandoned his claim, which is an essential element of laches. In June Duggal wrote letters to Krishna and made other attempts to locate and contact him. After hiring a private investigator and learning, in August, that Krishna had published his own issue of *Courier Diplomatique* in July, plaintiffs' lawyers wrote to the magazine's advertisers stating that Duggal was still the rightful publisher. Defendant is thus

---

**8.** It is noteworthy that the agreement Krishna signed also included a covenant not to compete "for a period of two years after either of us ceases becoming a stockholder." Whether Krishna ever was a stockholder is uncertain due to the absence of stock certificates and the allegations that he never lived up to the promises that were conditions precedent to his becoming a stockholder. It is clear, however, that Duggal took several actions in June and July, 1981, designed to sever Krishna from Courier Diplomatique, Inc. and that Krishna himself took similar actions. It is also alleged that Krishna still owes Duggal and Courier Diplomatique, Inc. a great deal of money.

disingenuous when he contends that only upon receipt of the complaint did he learn that Duggal objected to his continued publication of the magazine.

In addition to likelihood of success, plaintiffs have also demonstrated the likelihood of irreparable injury should Krishna be allowed to remain in the sole possession of the trademark and the accouterments that make publication of the magazine possible. The "primary significance of [a] mark . . . is not to identify the product, but rather, to identify its producer." *D C Comics, Inc. v. Powers, supra,* 465 F.Supp. at 846. Since Krishna took over *Courier Diplomatique* the magazine has grown thinner and the number of stories per issue has dropped. Consequently, Duggal is being injured by being associated with an arguably inferior magazine than he would produce. Moreover, Krishna lacks independent resources, and the magazine has been operating at a loss. Thus, the magazine may founder altogether under Krishna's sole management. Should this occur and were Duggal to win his suit, it would be difficult if not impossible for Duggal to restore the magazine. Being adjudged the rightful owner of the trademark would be of little value under such circumstances. Duggal is currently making disbursements on behalf of the magazine and testified that he will continue to make them because his reputation for creditworthiness is at stake. He has promised that he would keep the magazine going during the pendency of a preliminary injunction, and he is more financially able to do so than is Krishna. The balance of hardships thus tips in Duggal's favor. It is true that Krishna will probably be out of an editor's job, but he can market his editing skills and they need not suffer any diminution while an injunction is in force. He has contacts that are valuable, and he can continue to draw on them for stories for either *Courier Diplomatique* or other publications. Should he ultimately prove that he is the rightful owner of the trademark, the escrow provision will have ensured that he did not suffer any loss of income. On the other hand, if the magazine remains in Krishna's hands, Duggal will have paid in excess of $100,000 to, and

he will continue to be associated with a publication he arguably owns but which is in another's sole dominion. Duggal testified that what he ultimately wants is the opportunity to make the magazine succeed. If there is no magazine by the time the case is decided, or if its quality and good will have deteriorated, no remedy at law would provide adequate relief.

A preliminary injunction will issue as of this date.

## ORDER

For the reasons stated in an accompanying memorandum filed this date, it is this 7th day of January, 1983,

ORDERED That plaintiffs' motion for preliminary injunction be and it hereby is granted, and it is further

ORDERED That defendants Sundaram Rama Krishna and Courier Publications, Inc., and their agents, servants, employees, successors and assigns and all persons in active concert with them be enjoined, until the entry of judgment by the Clerk of the United States District Court for the District of Columbia in this proceeding, from:

(1) using in connection with a magazine or otherwise, the mark "Courier Diplomatique," or any simulation thereof, or any name, phrase or device in any manner colorably imitating the mark "Courier Diplomatique";

(2) representing that they have authority to do so;

(3) continuing to operate in any manner tending to deceive the public into believing that defendants are in any way connected with the publication *Courier Diplomatique;*

(4) soliciting or receiving subscription, advertising or other revenue for prior, present and future issues of *Courier Diplomatique;* any such revenue received by defendants to be placed in escrow with the District Court pending a final adjudication; and

(5) converting to their personal use any property belonging to any of the plaintiffs in this action, including but not limited to,

cashing checks made out to "Courier Diplomatique" or "Courier Diplomatique, Inc."; and it is further

ORDERED That all income received by plaintiffs in connection with the use of the trademark "Courier Diplomatique" from this day forward be placed in escrow with the District Court pending final adjudication, and it is further

ORDERED That plaintiffs shall make available to defendants and their counsel in a reasonable manner any and all financial statements regarding the use of "Courier Diplomatique," and it is further

ORDERED That defendants shall likewise make available to plaintiffs and their counsel in a reasonable manner any and all documentation regarding revenue received by defendants for prior, present and future issues of *Courier Diplomatique.*