Mailed:   September 30, 2005

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

DC Comics

v.

Pan American Grain Mfg. Co. Inc.
_____

Opposition No. 91125404
to application Serial No. 76304037
filed on August 23, 2001
_____

Patrick T. Perkins of Fross Zelnick Lehrman & Zissu, P.C. for DC Comics.

Jay A. Bondell of Schweitzer Cornman Gross & Bondell LLP for Pan American Grain Mfg. Co. Inc.


By the Board:

On August 24, 2005, the Board issued a final decision in this opposition.  The Board's opinion was designated "NOT CITABLE AS PRECEDENT OF TTAB."  On further consideration, the Board has now determined to designate its decision as citable precedent.

Attached is a copy of the decision, marked with the indication "THIS DISPOSITION IS CITABLE AS PRECEDENT OF TTAB."

The appeal period in this case continues to run from the date of the Board's final decision, August 24, 2005.

Opposition No. 91125404

THIS DISPOSITION IS
CITABLE AS PRECEDENT OF
THE TTAB

Mailed:  August 24, 2005
Designated as Citable Precedent:  September 30, 2005

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

DC Comics

v.

Pan American Grain Mfg. Co. Inc.
_____

Opposition No. 91125404
to application Serial No. 76304037
filed on August 23, 2001
_____

Patrick T. Perkins of Fross Zelnick Lehrman & Zissu, P.C. for DC Comics.

Jay A. Bondell of Schweitzer Cornman Gross & Bondell LLP for Pan American Grain Mfg. Co. Inc.
_____

Before Seeherman, Hairston and Chapman, Administrative Trademark Judges.

Opinion by Chapman, Administrative Trademark Judge:

Pan American Grain Mfg. Co. Inc. (a corporation of Puerto Rico) has filed an application to register on the Principal Register the mark KRIPTONITA for "prepared alcoholic fruit cocktail" in International Class 33.  The application is based on applicant's assertion of a bona fide

2

intention to use the mark in commerce on the identified goods.[1]

DC Comics (a New York partnership) filed a notice of opposition, alleging as grounds therefor that it (and its predecessors-in-interest) is the publisher of comic books and magazines featuring comic characters, "including the world-famous character Superman" (as well as, inter alia, Batman, Wonder Woman, and The Flash); that the Superman character was first introduced in a comic book in 1938; that opposer focuses enormous attention and effort "to develop the Superman mythos, including the character, his associates, his world, and other indicia associated with him"; that opposer's efforts include a vast array of literary works, television series, and feature films all of which result in the Superman mythos, the character and his universe having "captured the popular imagination"; that Superman was featured in a radio show from 1940 through 1951, and was the subject of an animated motion picture in 1941, a live action movie in 1948, a live action television series in 1953, an animated television series in 1966, and that at least some of these formats continue today (e.g.,

---

[1] The application does not include a translation of the term "KRIPTONITA." However, the record here is clear that the term "kriptonita" is Spanish for "kryptonite." See Carlin dep., p. 51, Ex. 54; Rubin dep., p. 26; and opposer's notice of reliance on applicant's answer to opposer's interrogatory No. 3, wherein applicant stated "…the word 'KRIPTONITA' has in fact been used as the Spanish equivalent of the word 'KRYPTONITE', the substance which weakens the comic book character Superman."

the television series "Smallville" which began in 2001); that opposer has "licensed the Superman character and related indicia with a broad array of consumer products, including food products"; that because of opposer's careful development of not only the Superman character, but also of his universe, "Superman has become associated with certain symbols and indicia which in the public mind are inextricably linked with the Superman character and which function as trademarks, both for literary and entertainment works featuring Superman and for various goods and services for which [opposer] has licensed others to use these marks" and that one of these indicia is Kryptonite (a rock from Superman's home planet, Krypton, which has a debilitating effect on his powers); that Kryptonite was first introduced in a 1943 radio episode, and was first introduced in the Superman comic book in 1949; that "since its introduction into the Superman mythos, Kryptonite has come to be recognized as a powerful symbol standing alone, and is immediately recognized as associated with and identifying the character Superman, as well as goods and services manufactured, distributed and/or licensed by or on behalf of [opposer]"; that "Kryptonite has become famous and instantly represents to the public Superman and such goods and products to consumers"; that since at least 1979, KRYPTONITE has been affixed to a wide array of products coming from or

licensed by opposer; that KRYPTONITE is an arbitrary and famous mark and is thus strong and entitled to a broad scope of protection; that opposer owned [now expired] registrations for the mark KRYPTONITE for "t-shirts"[2] and for "novelty item, namely glowing rock";[3] that opposer owns application Serial No. 75489954 [now registered] for the mark KRYPTONITE for "toys and sporting goods, including games and playthings, namely action figures and accessories therefor";[4] that applicant adopted and applied to register the mark KRIPTONITA with full knowledge of opposer's rights in the Superman character and related indicia and in the KRYPTONITE mark and with an intent to trade off the good will of opposer's marks; that applicant's identified goods are related to goods with which opposer has licensed some of its Superman related indicia; that applicant's mark, when used on its identified goods, so resembles opposer's previously used and registered mark KRYPTONITE, as to be likely to cause confusion, mistake, or deception under Section 2(d) of the Trademark Act; and that applicant's use of its mark will violate Section 43(c) of the Trademark Act because it will "dilute Opposer's famous mark both by

---

[2] Registration No. 1231983, issued March 22, 1983, expired for failure to renew in December 2003.
[3] Registration No. 1107333, issued November 28, 1978, expired for failure to renew in September 1999.
[4] Application Serial No. 75489954 issued as Registration No. 2656768 On December 3, 2002.

4

blurring as well as by tarnishment" as the association of Superman-related indicia with an alcoholic beverage is inconsistent with the wholesome image of Superman which opposer has "carefully cultivated over the last 60 years."

During its trial period, opposer made of record two registrations for its mark KRYPTONITE, one for "clothing namely, T-shirts,"[5] and one for "toys and sporting goods, including games and playthings, namely, action figures and accessories therefor."[6] Applicant has clearly treated opposer's two registrations as of record. (See e.g., applicant's brief, pp. 9 (footnote 2), 15, 19, 25, 28.) To whatever extent it is necessary, the Board holds that opposer's pleading is amended to conform to the evidence pursuant to Fed. R. Civ. P. 15(b) to include an allegation of ownership of these registrations.

In its answer applicant admits that opposer owns (the now expired) Registration Nos. 1231983 and 1107333, as well as (the now registered) application Serial No. 75489943, but otherwise denies the salient allegations of the notice of opposition. Applicant asserts as an "affirmative defense" that the word "kryptonite" is widely used as a mark by

---

[5] Registration No. 1239506, issued May 24, 1983, Section 8 affidavit accepted, Section 15 affidavit acknowledged, renewed (not pleaded).
[6] Registration No. 2656768, issued December 3, 2002 (pleaded as an application in the notice of opposition).

5

others and any rights of opposer in its KRYPTONITE mark are of narrow breadth.

Both parties filed briefs on the case;[7] neither party requested an oral hearing.

The record consists of the pleadings; the file of the opposed application; opposer's notice of reliance filed March 1, 2004 (Items A-D); opposer's testimony, with exhibits, of (i) Cheryl Rubin, opposer's vice president brand management, and (ii) Michael Carlin, opposer's senior group editor; applicant's testimony, with exhibits, of Geraldine Czachowski, a secretary at applicant's attorney's law firm; applicant's notice of reliance filed June 1, 2004 (Exhibits A-D); and opposer's rebuttal testimony, with exhibits, of Jay Kogan, opposer's deputy general counsel.

**Parties**

Opposer, DC Comics, is primarily a publisher of print media containing stories about various superhero characters--the first superhero character being Superman in 1938, followed by Batman, Wonder Woman, Green Lantern, The Flash,

---

[7] Applicant objected to opposer's references in its brief on the case to the court cases of DC Comics v. Kryptonite Corporation and DC Comics v. Powers as evidence of the purported fame and use of opposer's Kryptonite mark because the renown and use of opposer's mark or lack thereof, must be determined by the Board based on the evidence properly before it. Applicant's objection is well taken to the extent that it is true the Board must make its findings based on the evidence before the Board and independent of the findings of other tribunals. However, there is nothing improper in a party citing published decisions in its brief, and therefore the cases have been considered for whatever value they may have.

and many others.  Opposer's Superman character appears in such media as comics (continuously since 1938); comic strips (from 1939 to the late 1950s and then the 1960s and 1970s); radio (in the 1940s and again in the 1990s); movies, both animated and live action, (in the 1940s and then in the 1970s, the 1980s and the 1990s); television (continuously since the 1950s); video games (since the 1980s); and Internet "Web-isodes" (since about 2002).  Opposer licenses young adult novels featuring Superman.  Opposer's published comic books are available in about 45 countries and are translated into 20 languages, including Spanish.

Opposer has made subtle changes over time to keep the Superman character and stories current (e.g., body type, changing Lex Luthor from a mad scientist to a "Trump-like businessman").  "Kryptonite" was first introduced in the radio show in 1943 and it first appeared in the comic book in 1949.  It has appeared continuously since that time in various forms--a rock, a crystal or a gas, generally in a glowing green color, but it has also appeared in the color red.  According to opposer, "Kryptonite" plays a key role in the Superman stories as it is the only thing that can bring Superman down, and it is used at least ten times a year in the Superman stories (Carlin dep., pp. 33-34).  "Kryptonite" appears in opposer's "Who's Who of the DC Universe" published in 1986.  (Carlin dep., p. 34, Exhibit 42.)  It

has appeared in all the media wherein Superman appears, including the original radio show through to the current television show "Smallville" and to video games.

When a company obtains a license for the Superman property it is allowed to use any of the elements of the Superman mythos or universe including "Kryptonite." (Rubin dep., pp. 13-14.)

Opposer receives between 25 and 50 percent of its revenues from licensing. In the last ten years, DC Comics received about $1 billion dollars in licensing revenue, the primary licenses being for the Superman, Batman and Wonder Woman characters. The Superman character and mark is in demand by manufacturers, retailers and consumers and it is licensed in almost every consumer product category, including clothing, home furnishings (e.g., bedding, curtains, mirrors, cookie jars, dishes, glassware, lamps, clocks, picture frames), video games, novelties and gifts (e.g., magnets, stickers, tattoos), books, toys, collectibles, foods (e.g., pretzels, peanut butter, nut mix, cake decorations, cakes, cookies, breakfast cereals, milk), and publishing. The Superman character and mark is also licensed for promotions, including branded foods and beverages, fast food restaurants, and tie-ins with other consumer goods. There are currently about 1500 licenses for opposer's Superman property. Opposer does not license its

superhero characters or the marks associated with them for tobacco products, alcoholic beverages, or for political, religious or controversial subjects. (Rubin dep., pp. 10-12, 21 and 27-28.) The categories of licensing that are of "particular importance" to opposer's licensing program are toys, apparel, collectibles, theme parks, branded foods and fast food restaurants. (Rubin dep., pp. 60-61.)

In the 1980s opposer licensed use of the mark KRYPTONITE for a jewelry pin (Rubin Exhibit 10); in 1997, opposer licensed use of the mark KRYPTONITE for gum (Rubin Exhibit 34); and in 2000, opposer licensed a novelty item, an "authentic replica" of a KRYPTONITE crystal, which sold for $250 (Rubin Exhibit 14). Opposer has used its mark KRYPTONITE in promotions and tie-ins with Kraft macaroni and cheese -- an advertisement features the phrase "It Sure Beats A Bowl Of Kryptonite" (Rubin Exhibit 37); and Diet Coke -- an advertisement is headed "Caffeine Free. Kryptonite Free." (Rubin Exhibit 30).

Opposer maintains quality control over all licensed uses, and opposer vigilantly polices the non-authorized uses of Superman and the indicia related to him, including "Kryptonite."

The information of record regarding applicant comes from applicant's application file; from applicant's response to a 1997 Office action in a related application; and from

applicant's answers to certain of opposer's first set of interrogatories (the latter items having been made of record by opposer). Applicant, Pan American Grain Mfg. Co. Inc., is a Puerto Rico corporation located in Guaynabo, Puerto Rico. Applicant intends to sells its prepared alcoholic fruit cocktail through "supermarkets and warehouses" (applicant's answer to opposer's interrogatory No. 9). Applicant cannot recall any particular reason for the selection of the mark KRIPTONITA (applicant's answer to opposer's interrogatory No. 11); but prior to the time of adopting the mark KRIPTONITA, applicant's principals "were aware of Opposer's mark in association with the comic book character Superman" (applicant's answer to opposer's interrogatory No. 14).

A proposed label for applicant's identified goods is reproduced below:[8]

---

[8] Opposer introduced one of applicant's labels at the deposition of Michael Carlin, opposer's Exhibit 55. Opposer's attorney stated to the witness that the label was produced by applicant in response to discovery requests. Mr. Carlin testified that the green color is similar to that used by opposer to denote KRYPTONITE, that it is glowing and it is crystal-like, that it appears to be on a snowy background, which is like Superman's arctic fortress where he would hide from Kryptonite. (Carlin dep., pp. 53-54.) Although opposer's identification of the exhibit would not be sufficient to authenticate it, applicant has essentially stipulated to its authenticity and its admission into the record by acknowledging in its brief on the case that the label was provided to opposer by applicant. (See applicant's brief, p. 27, footnote 10.)



The only testimony taken by applicant was that of applicant's attorney's secretary who testified with regard to her assigned project of searching the word "kryptonite" on a computer search engine; her purchase of several third-party products with the mark KRYPTONITE; and her finding several additional websites showing "KRYPTONITE" thereon but from which she did not purchase products.

**Standing**

As explained previously, opposer made of record two current registrations for the mark KRYPTONITE, one for "clothing namely, T-shirts," and one for "toys and sporting goods, including games and playthings, namely, action figures and accessories therefor."  Without doubt, opposer's two registrations and the testimony about its activities establish that opposer has standing to bring this opposition.  See Cunningham v. Laser Golf Corp., 222 F.3d

11

943, 55 USPQ2d 1842 (Fed. Cir. 2000). Moreover, applicant has not contested opposer's standing.

**Priority**

With regard to the issue of priority, because opposer owns valid and subsisting registrations of its pleaded mark, the issue of priority does not arise with respect to the goods listed in the registrations. See King Candy Company v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974); and Carl Karcher Enterprises Inc. v. Stars Restaurants Corp., 35 USPQ2d 1125 (TTAB 1995).

Moreover, the evidence of record shows that opposer used KRYPTONITE as a mark on gum, jewelry pins, a necklace sold as part of "Smallville action figures, and "authentic replica" Kryptonite crystals (Rubin dep., Exhibits 34, 10, 6, and 14 and 22, respectively), all prior to August 23, 2001, the constructive use date of applicant's intent-to-use application, and the earliest date on which applicant is entitled to rely. Opposer has also shown that, prior to applicant's constructive use date, opposer used KRYPTONITE in conjunction with promotions for food products and beverages, specifically, Kraft Macaroni and Cheese Dinners (Rubin dep., Exhibit 37 -- "IT SURE BEATS A BOWL OF KRYPTONITE"); and Coca-Cola's Diet Coke (Rubin dep., Exhibit 30 -- "KRYPTONITE FREE").

12

**Likelihood of Confusion**

We turn now to a consideration of the issue of likelihood of confusion. Our determination of likelihood of confusion is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Company, Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

We consider first the du Pont factor of the similarity or dissimilarity of the marks. Opposer's mark is KRYPTONITE and applicant's mark is KRIPTONITA. The record establishes that both "kryptonita" and "kriptonita" are used as the Spanish term for "kryptonite." Under the doctrine of foreign equivalents, we must therefore regard the marks, KRIPTONITA and KRYPTONITE, as being identical. Further, aside from the fact that they are identical in connotation, the marks are very similar in appearance and pronunciation, such that Spanish-speaking people would clearly view the marks as the same.

We turn to a consideration of the du Pont factor regarding the similarity or dissimilarity and nature of the goods. Applicant's goods are identified as "prepared alcoholic fruit cocktail." Opposer owns registrations of the mark KRYPTONITE for "clothing namely, T-shirts" and for

13

"toys and sporting goods, including games and playthings, namely, action figures and accessories therefor." These goods of opposer's are obviously different from applicant's goods. However, it is clear from this record that opposer uses the mark for more than just these goods. In fact, KRYPTONITE is a merchandising mark, and it has been used, as an indicia of the Superman mythos, in promoting food products and beverages and has been the subject of licenses for certain collateral products.

It is common knowledge, and a fact of which we can take judicial notice, that the licensing of commercial trademarks on "collateral" products has become a part of everyday life. See Turner Entertainment Co. v. Nelson, 38 USPQ2d 1942, 1945-1946 (TTAB 1996) and cases cited therein. Moreover, the record shows through testimony and evidence that opposer uses its Superman superhero as a merchandising mark (there are currently about 1500 licenses for opposer's Superman property), licensing the Superman mark and character for "just about every consumer products category" and for promotions including "branded foods and beverages, fast food promotions, tie-ins with other consumer products" (Rubin dep., pp. 10-11). Opposer also licenses the Superman character for "all forms of media" (e.g., movies, television) and for publishing (Rubin dep., p. 11). Some of opposer's licenses for its Superman character include

14

clothing (e.g., dresses, slips, socks, pajamas, robes, shirts, jackets, boots, sandals); watches; greeting cards; video games; trading cards; toothbrushes; hot chocolate; breakfast cereal; cakes; chocolate bars; bath sheets; towels; shower curtains; costumes; dolls; clocks; stickers; food wrap; cosmetics; pencil cases; playing cards; lunch boxes; tents; calendars; pedal cars; buttons; figurines; key chains; sunglasses; chess/checker sets; books; audio cassettes; kites; purses; wallets; various items of jewelry (e.g., earrings, necklaces, bracelets); check holders; bicycle bells; bicycles; combs. Opposer has licensed the Superman character and mark for food and beverage promotions and tie-ins with, among other entities, Burger King and Kellogg's.

The mark KRYPTONITE is one of the marks that opposer licenses as a part of the Superman licenses. Although KRYPTONITE has not been used on the wide variety of goods that the Superman mark itself has been used, it has been used on various items. Specifically, and as stated previously, the record shows that opposer has used the mark KRYPTONITE through licensees prior to the filing date of applicant's application (August 23, 2001), on gum, jewelry pins, a necklace sold as part of "Smallville" action figures, and "authentic replica" Kryptonite crystals. Further, while not technical trademark use, opposer has used

15

KRYPTONITE in conjunction with promotions for food products and beverages, specifically, Kraft Macaroni and Cheese Dinners (advertisement headed "IT SURE BEATS A BOWL OF KRYPTONITE"); and Coca-Cola's Diet Coke (advertisement headed "KRYPTONITE FREE").

Consumers are likely to view KRYPTONITE as a merchandising mark in the same manner that Superman is a merchandising mark: the "element" to which opposer gave the name "kryptonite" has been used in the various Superman stories for so many decades, and is an integral part of the stories, to the point that it is akin to a character in the stories. In addition, because opposer coined the word "KRYPTONITE" for the fictional substance (and therefore it has no other meaning), when consumers see the term they will view it as an indicia of the Superman mythos.

While applicant's prepared alcoholic fruit cocktails are not the same goods as those on which opposer's KRYPTONITE mark has been used or associated,[9] the question is whether the parties' respective goods are sufficiently related such that consumers will believe that they come from or are associated with the same source. That is, in this

---

[9] In fact, opposer's witnesses testified that because Superman is a family-friendly, wholesome character, opposer does not license Superman or any of the indicia such as KRYPTONITE, for goods such as alcohol and tobacco, or for political, religious, sexual or controversial matters. (Rubin dep., pp. 12-13 and 78; Carlin dep., p. 54.)

16

marketing environment, including the licensing of commercial marks, will the purchasing public believe that applicant's prepared alcoholic fruit cocktail comes from or is sponsored by or associated with opposer? On this record, we find that the answer is in the affirmative. As our primary reviewing Court stated in Recot Inc. v. M.C. Becton, 214 F.3d 1332, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000): "Even if the goods in question are different from, and thus not related to, one another in kind, the same goods can be related in the mind of the consuming public as to the origin of the goods. It is this sense of relatedness that matters in the likelihood of confusion analysis." The same Court reiterated in the case of Hewlett-Packard Company v. Packard Press, Inc., 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) as follows: "Even if the goods and services in question are not identical, the consuming public may perceive them as related enough to cause confusion about the source or origin of the goods and services."

Because opposer has used KRYPTONITE as a merchandising mark with respect to a variety of goods; because consumers recognize that, in the general marketing environment, merchandising marks are used to identify a variety of goods and services; and because opposer has used the term KRYPTONITE in connection with the promotion of certain food and beverage products, we find that, in the sense discussed

17

in the Recot and Hewlett Packard cases, applicant's goods and opposer's goods are related. In short, based on the above, we find that consumers, seeing KRIPTONITA on prepared alcoholic fruit cocktails, are likely to believe that the mark has been licensed by opposer for such goods, and that the goods are therefore sponsored by opposer. See In re Martin's Famous Pastry Shoppe, Inc., 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984); In re Peebles Inc., 23 USPQ2d 1795, 1796 (TTAB 1992); and In re Melville Corp., 18 USPQ2d 1386 (TTAB 1991).

In reaching this conclusion, we note that the relevant consuming public are adults, because applicant's goods are alcoholic beverages that may only be purchased by adults. Adults, however, would be very aware of the prevalence and importance of merchandising marks. Moreover, because "kryptonite" has been involved in the Superman stories since 1943 and is such a well-known part of the story, adult purchaser's of applicant's goods would be aware of the term "kryptonite" as part of the Superman mythos from their childhoods, as well as from their exposure to the word as adults through general entertainment movies and television programs.

Applicant relies on the case of Paramount Pictures Corp. v. Romulan Invasions, 7 USPQ2d 1897 (TTAB 1988) essentially for the proposition that earlier use of a term

18

as an element of a literary work does not establish trademark use. The Paramount case does not apply to the facts of the case now before us. The opposer therein did not own a registration for the mark "ROMULAN(S)" and did not show trademark use of the term on goods (except for space ship models). In our case, opposer's mark KRYPTONITE has been the subject of trademark licensing agreements, it has actually been used as a trademark pursuant to such licenses, and it has been registered as a trademark. Thus, here, there is no question that KRYPTONITE would be regarded as a trademark and not merely a "character" name.

Applicant has attempted to show that consumers would not necessarily associate KRYPTONITE with opposer by pointing to third-party uses and registrations of KRYPTONITE. Thus, we turn to the du Pont factor of the number and nature of similar marks in use on similar goods. Applicant submitted the testimony of applicant's attorney's secretary, Geraldine Czachowski, regarding third-party websites which include "kryptonite" thereon, which she found through a search on the Internet, and a notice of reliance on seven third-party registrations, all of which consist of or include the term KRYPTONITE.

With regard to the third-party registrations, all are owned by Kryptonite Corporation: six are for goods in International Class 6 (e.g., locks), while the remaining one

19

is for bicycle parts in International Class 12 and bags in International Class 18.  In 1983, opposer entered into an agreement with Kryptonite Corporation regarding use of the term KRYPTONITE on bicycle and motorcycle locks and accessories by which Kryptonite Corporation agreed to a limitation on the goods on which it would use the mark KRYPTONITE, as well as limitations on the manner of its use so as to avoid confusion.  (Kogan dep., Exhibit 5.)

We do not agree with applicant's general statement that essentially a consent agreement with one third party is an admission that another's use of the mark is not likely to cause confusion.  No such presumption can be made from that type of agreement.  More importantly, we cannot extrapolate from opposer's decision to enter into this specific agreement with Kryptonite Corporation regarding the specific marks and goods covered by the agreement, and with specific safeguards to avoid confusion, that there can be no likelihood of confusion with applicant's use of KRIPTONITA for its prepared alcoholic fruit cocktails, which are very different from the Kryptonite Corporation's goods.

In addition to these third-party registrations owned by Kryptonite Corporation, applicant submitted the testimony of Ms. Czachowski about her search of the word "kryptonite" on a search engine.  As part of her Internet search, she purchased several items of goods over the Internet which use

the word "KRYPTONITE," including a package of capsules, (Exhibit 3); two bottles of hot sauce (Exhibits 6 and 7); one Wella liquid hair gel (Exhibit 15); one eye shadow (Exhibit 17); a coffee mug, a t-shirt and a bumper sticker, all from the "Kryptonite Music Club" (Exhibits 21-23 and 40); and a metallic paper cosmetic compact (Exhibit 26). Ms. Czachowski also went to a bicycle shop in Scarsdale, New York, and purchased locks made by the Kryptonite Corporation (Exhibits 43-45). In addition, she testified as to numerous other websites that she visited but from which she did not purchase anything because, for example, the site offered services such as web design or the goods were too large or too expensive to purchase, such as boats (Exhibits 27-40); and that she found several websites which include different recipes for drinks called "Kryptonite" (Exhibit 41).

While at first glance it appears there are numerous third-party uses of KRYPTONITE for various goods and services, opposer's cross-examination of Ms. Czachowski and the testimony of opposer's rebuttal witness, Jay Kogan, show that there are only a few relevant and unchallenged third-party uses. Specifically, opposer has established that the capsules come from the Netherlands (e.g., Czachowski dep., pp. 45-48); that on one of the cosmetic items "Kryptonite" is used to identify a color shade and not the product (e.g., Czachowski dep., p. 52); and that opposer has stopped the

third-party use by Wella for a hair gel (through a law suit and settlement -- Kogan dep., Exhibit 2); the use by Figuero Brothers for hot sauce (through a cease and desist letter and agreement thereto -- Kogan dep., Exhibit 8); and the use by Louis Vuitton Liquid Metal Eyes for eye shadow in the color "Kryptonite" (through a settlement agreement -- Kogan dep., Exhibit 10). In addition, opposer has entered into a license with Kryptonite Kollectibles (Kogan dep., pp. 27-29). As for "Kryptonite Music Club," their items are sold on the CafePress.com website. In the past, this entity has been cooperative when opposer has informed them of infringing uses, and opposer expects them to remove the objectionable items from the "Kryptonite Music Club" as well. (Kogan dep., pp. 30-31).

Jay Kogan also testified that opposer has sent information on the "KRYPTONITE Performance Boats," which sells very expensive custom made racing boats, to opposer's outside counsel, but opposer has taken no action as yet in view of the nature of the product and the very small niche market in which those boats are sold.

Thus, this record shows only that there are a very few third-party uses of the mark KRYPTONITE (generally on the Internet) which have not been stopped by opposer. We cannot conclude from applicant's evidence that KRYPTONITE has lost its strong significance with regard to opposer's Superman

22

character and comic books. To the contrary, some of the third-party evidence submitted by applicant shows a connection with the Superman mythos and it appears that these third parties were attempting to play on this connection. For example, the labels on the bottles of hot sauce include a depiction of kryptonite crystals and the statement "You'll run for water faster than a speeding bullet," which clearly relates to Superman as acknowledged by Ms. Czachowski ("It is associated with Superman." Czachowski dep., p. 50). Similarly, the KRYPTONITE MUSIC CLUB coffee mug and t-shirt and website all include the image of a muscular man wearing a cape who "would appear to be a super hero" (Czachowski dep., p. 55).

We find that there is no significant third-party use of the mark KRYPTONITE, and this factor therefore does not favor applicant.

In considering the fifth du Pont factor (the fame of the prior mark), opposer contends that its mark KRYPTONITE is strong and entitled to the broadest scope of protection under the Trademark Act. Applicant argues that opposer's KRYPTONITE mark is not strong or famous; that opposer has submitted "virtually no evidence" of its use as a mark but only as "a well-recognized element of the Superman stories" (brief, p. 17); that opposer's extensive licensing and use of the Superman character and mark does not establish rights

23

in KRYPTONITE as a mark; and that the many third-party uses of KRYPTONITE undercuts opposer's assertion that its involved mark is strong.

We agree with applicant that opposer has not demonstrated that KRYPTONITE is famous as a mark for its goods. Opposer has not submitted sales and advertising figures that apply specifically to its KRYPTONITE mark. Although the term "kryptonite" has appeared throughout opposer's various Superman stories in various media for many years, such that the term and the mythological element may be well known, such notoriety does not constitute fame for purposes of the du Pont factor, which deals with the fame of the mark, not merely the fame of the term. But there is no doubt on this record that opposer engages in an extensive licensing program for a broad range of merchandise and opposer has shown some such licensing with specific regard to its KRYPTONITE mark. Further, KRYPTONITE is a coined word and, as such, is entitled to a broader scope of protection.

Evidence of applicant's bad faith adoption is pertinent to our likelihood of confusion analysis under the thirteenth du Pont factor. Opposer argues that applicant's intent in selecting the mark KRIPTONITA was to trade off of opposer's goodwill; that applicant applied for the mark KRIPTONITA knowing that it had no meaning other than as the Spanish

24

equivalent of the word for KRYPTONITE, the substance which weakens the comic book character Superman (opposer's notice of reliance, Item B); that one of applicant's proposed labels features a glowing green crystal recognizable as a depiction of KRYPTONITE from opposer's Superman comics; and that applicant acknowledged that it was aware of opposer's mark in association with the comic book character prior to adopting the mark KRIPTONITA.

Applicant argues that mere knowledge of another's mark is not sufficient to establish wrongful intent; and that opposer cannot establish applicant's intent to trade off of opposer's goodwill "merely because applicant's mark might call to mind the element that overpowers superman." (Brief, p. 26.)

From this cumulative evidence, particularly, applicant's acknowledgement that it applied for the mark KRIPTONITA knowing it was Spanish for KRYPTONITE, the name of the substance in the Superman stories; and that its proposed label clearly depicts a green "kryptonite" crystal, we find that applicant's adoption of the mark KRIPTONITA was in bad faith, with the intention to trade off of opposer's KRYPTONITE mark. Such bad faith intent is strong evidence that confusion is likely as such an inference is drawn from the imitator's own expectation of confusion. See Broadway Catering Corp. v. Carla Inc., 215 USPQ 462 (TTAB 1982). See

also, DC Comics, Inc. v. Powers, et al., 465 F.Supp. 843, 201 USPQ 99 (SDNY 1978).

On the basis of the preceding discussion of the factors favoring opposer, we find that opposer has established its claim of likelihood of confusion. See Time Warner Entertainment Co. v. Jones, 65 USPQ2d 1650 (TTAB 2002). See also, Conan Properties, Inc. v. Conans Pizza, Inc., 752 F.2d 145, 225 USPQ 379 (5th Cir. 1985); Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76, 211 USPQ 1017 (2nd Cir. 1981); and American Footwear Corp. v. General Footwear Co., Ltd., 609 F.2d 655, 204 USPQ 609 (2nd Cir. 1979). Cf. Viacom International Inc. v. Komm, 46 USPQ2d 1233 (TTAB 1998).

Applicant, as the newcomer, had the obligation to select a mark which would avoid confusion, but it did not do so. Therefore, to the extent there is any doubt on the issue of likelihood of confusion, such doubt must be resolved in favor of opposer. See TBC Corp. v. Holsa Inc., 126 F.3d 1470, 44 USPQ2d 1315 (Fed. Cir. 1997); and In re Hyper Shoppes (Ohio) Inc., 837 F.2d 840, 6 USPQ2d 1025 (Fed. Cir. 1988).

Because we find opposer has established its likelihood of confusion claim, we do not reach its claim of dilution under Section 43(c) of the Trademark Act.

**Decision:**  The opposition is sustained on the ground of likelihood of confusion under Section 2(d) of the Trademark Act.