THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: March 28, 2008
PTH

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

L.C. Licensing, Inc.
v.
Cary Berman

_____

Opposition No. 91162330
to application Serial No. 78320850
filed on October 30, 2003

_____

Kieran G. Doyle of Cowan, Liebowitz & Latman, P.C. for L.C.
Licensing, Inc.

Cary Berman, pro se.

_____

Before Seeherman, Quinn and Hairston, Administrative
Trademark Judges.

Opinion by Hairston, Administrative Trademark Judge:

An application has been filed by Cary Berman
(applicant) to register the mark ENYCE (standard characters)
for "custom automotive accessories, namely, fitted car
covers, shift knobs, brake pads, and wheels for land
vehicles, license plate holders and spoilers for vehicles"
in International Class 12.[1]

---

[1] Serial No. 78320850, filed on October 30, 2003, based on an
allegation of a bona fide intention to use the mark in commerce.

Registration has been opposed by L.C. Licensing, Inc. (opposer). In its amended notice of opposition, opposer alleges that it is the owner of the following marks and registrations:

(1)  ENYCE (typed drawing form),[2] and

(2)  ENYCE and design, shown below,[3]



both of which are registered for apparel and headwear for men, women and children, namely, hats, caps, visors, headbands, shirts, jackets, jogging suits, pants, coats, T-shirts, shorts, tank tops, skirts, warm-up suits, sweat shirts and sweat pants.[4]

Opposer further alleges that its ENYCE marks "have been the subject of extensive press and media coverage;" and that "in part due to the media coverage given to opposer's marks,

---

[2] Registration No. 2093751, issued on September 9, 1997; renewed.
[3] Registration No. 2351411, issued on May 23, 2000; Section 8 affidavit accepted; Section 15 affidavit acknowledged.
[4] Opposer also pleaded ownership of Registration No. 2338404, issued April 4, 2000, for the mark LADY ENYCE for various women's clothing items. While a certified copy of this registration was made of record which shows that the registration is subsisting and owned by opposer, we note that the records of the U.S. Patent and Trademark Office show that the registration was canceled for failure to file a Section 8 affidavit. In view thereof, no further consideration will be given to this registration.

and in part due to opposer's extensive use of opposer's marks, [such marks] have acquired enormous value and goodwill and have become extremely well-known and famous;" that applicant's mark, when applied to applicant's goods, so resembles opposer's ENYCE marks for its products as to be likely to cause confusion, mistake or deception; and that applicant did not have a bona fide intention to use his mark in commerce on the specified goods when he filed his application.

Applicant, in his answer, denied the salient allegations of the amended notice of opposition.

<u>The Record</u>

The record consists of the pleadings; the file of the involved application; the testimony deposition (with exhibits) of opposer's founder and vice-president, Rolando Felix; and opposer's notices of reliance on the following: certified copies of opposer's pleaded registrations, applicant's answers to opposer's interrogatories and requests for production of documents,[5] excerpts from printed publications, third-party registrations for the mark MECCA, applicant's application for the mark MECCA, the discovery deposition of applicant, and Internet printouts (with the

---

[5] Although documents submitted in response to document production requests generally cannot be made of record by notice of reliance, See Trademark Rule 2.120(j)(3)(ii), here opposer submitted applicant's responses that no such documents exist.

declaration of William Cadenilla, the paralegal who conducted the Internet searches), submitted pursuant to the parties' stipulation.

Applicant submitted notices of reliance on the discovery deposition (with exhibits) of Rolando Felix; the testimony deposition (with exhibits) of opposer's president, Evan T. Davis; and letters and emails between opposer's former counsel herein and applicant.[6]

<u>Preliminary Matter</u>

On July 19, 2007, after the parties had filed main briefs herein, applicant filed a "Motion To Allow New Information." Applicant seeks to introduce a copy of a July 11, 2007 <u>Wall Street Journal</u> article which applicant maintains shows that opposer intends to abandon its ENYCE mark. Opposer has filed a brief in opposition to applicant's motion.

By way of this motion, applicant essentially seeks to reopen his testimony period and introduce newly discovered evidence. <u>Trademark Board Manual of Procedure</u> (TBMP) §509.01(b)(2) (2d ed. rev. 2004) provides that:

---

[6] Letters and emails are generally not proper subject matter for introduction by notice of reliance because they do not constitute printed publications under Trademark Rule 2.122(e). However, opposer has treated these materials as being of record, setting forth in its brief that such materials are part of the "evidence of record." Therefore, we consider opposer to have stipulated to the submission of this evidence, and have treated it as of record.

> If a party files a motion to reopen its testimony period to introduce newly discovered evidence, the moving party must show not only that the proposed evidence has been newly discovered, but also that the evidence could not have been discovered earlier through the exercise of reasonable diligence. However, even if a sufficient showing of due diligence has been made, the Board will not automatically reopen a party's testimony period for introduction of new evidence. The Board must also consider such factors as the nature and purpose of the evidence sought to be brought in, the stage of the proceeding, and prejudice to the nonmoving party. (footnotes omitted)

In view of the article's publication date, there is no question that the article constitutes newly discovered evidence, and that it could not have been discovered earlier. However, insofar as the nature of the evidence is concerned, a newspaper article is probative only for what it shows on its face, not for the truth of the matters contained therein, unless a competent witness testifies to the truth of such matters. TBMP §704.08 (2d ed. rev. 2004). In other words, the article is not evidence of opposer's intent to abandon its ENYCE mark. Also, applicant's contention that the article shows that opposer intends to abandon its ENYCE mark is misleading because the article refers to an attempt to "sell <u>or license out or possibly</u> discontinue …. Enyce." (emphasis added). Further, considering the stage of this proceeding, to allow applicant to submit this article would clearly be prejudicial to opposer. Applicant's contention that opposer intends to abandon its ENYCE mark could only be entertained in the

context of a counterclaim to cancel opposer's registrations on the ground of abandonment, and therefore what is essentially a new trial would have to be commenced.

Under the circumstances, applicant's motion is denied.[7]

## Standing and Priority

Because opposer has properly made its pleaded registrations of the marks ENYCE and ENYCE and design of record, we find that opposer has established its standing to oppose registration of applicant's mark.  Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); and Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).  Moreover, because such registrations show that opposer is the current owner thereof and that each is valid and subsisting, there is no issue with respect to opposer's priority.  King Candy Co., Inc. v. Eunice King's Kitchen Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).  We add, however, that priority is also clearly established by the evidence showing opposer's use since 1997 of the registered marks ENYCE and ENYCE and design for the goods identified in the registrations.

## Likelihood of Confusion

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative

---

[7] Because we will not allow a reopening of the case in order to allow applicant the opportunity to file a counterclaim, the principle of res judicata cannot apply to such a claim.

6

facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

The Marks

We first consider the du Pont factor regarding the similarity or dissimilarity of the marks in terms of sound, appearance, connotation and commercial impression. We note that applicant does not argue that his ENYCE mark is dissimilar to opposer's ENYCE mark in typed drawing form in any respect. In terms of appearance, the marks are obviously identical. With respect to sound, opposer has suggested several different ways of pronouncing its mark. Suffice it to say that there is no correct pronunciation of a mark, and in any event, because the marks are identical in appearance, they will be pronounced in the same ways. Insofar as connotation is concerned, ENYCE is basically an arbitrary term which is devoid of ordinary dictionary or other meaning with the exception of trademark significance. To the extent that opposer's and applicant's ENYCE marks have any connotation, the connotation is the same. Inasmuch as the marks are identical in terms of sound, appearance, and connotation, the overall commercial impressions conveyed by the marks are the same as well.

Further, we find that applicant's ENYCE mark and opposer's ENYCE and design mark are identical in sound, and highly similar in appearance, connotation and commercial impression. Again, applicant does not argue otherwise. In terms of sound, obviously the design portion of opposer's mark will be not be spoken, and thus, the marks are identical in this respect. Further, it is well settled that if a mark comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods. In re Appetito Provisons Co., 3 USPQ2d 1553 (TTAB 1987). Here, the term ENYCE in opposer's ENYCE and design mark is identical to applicant's ENYCE mark. When we compare these marks in their entireties, with appropriate weight given to the term ENYCE in opposer's mark, we find that the marks are highly similar in appearance, connotation and commercial impression. Thus, the du Pont factor of the similarity of the marks favors a finding of likelihood of confusion.

Fame

Opposer markets urban lifestyle clothing and accessories. This is a style or category of clothing, rather than a description of the location of the consumers of the clothing. Indeed, the market for urban lifestyle clothing and accessories is not limited to shoppers in urban areas, but rather the products appeal to shoppers in

8

suburban and rural areas as well. From 1997 through 2006, sales of ENYCE branded goods totaled over $600 million. Opposer's ENYCE products are sold at approximately 2000 locations in the United States. The products are sold in major department stores such as Bloomingdale's, Nordstrom's, Dillard's and Saks Fifth Avenue, as well as in high-end specialty stores. Every major mall has within it an average of three separate stores selling ENYCE goods.

From 1997 through 2006, opposer spent approximately $32 million on marketing, approximately $13 million of which was allotted to advertising. This included print advertisements, billboards, bus and train advertisements, and radio advertisements. In terms of print advertisements, opposer advertises in magazines geared to the urban lifestyle market. Such magazines include Vibe, a national music magazine with a monthly circulation of approximately 1,000,000; and XXL and Source, both of which are nationally distributed magazines with circulations over 500,000. Additional magazines in which opposer advertises include Vibe Vixen, Elle Girl, Complex, Fader, Elemental and Dub.

The billboard advertisements appeared in New York City's Harlem and Times Square, on Sunset Boulevard during the Grammy Awards and the Oscar Awards, and in Houston, Texas during the 2006 National Basketball Association All-Star Game. Opposer has 115,000 registered users of its

website and it has had as many as 80,000 unique visitors to its website in some months.

Opposer's clothing has been worn by performers in Hip-Hop and urban music videos, and by actors and actresses in television shows and movies such as "The Fast and The Furious" and "2 Fast 2 Furious."

The Court of Appeals for the Federal Circuit has held that the fame of an opposer's mark, if it exists, plays a "dominant role in the process of balancing the *DuPont* factors." Recot Inc. v. M.C. Becton, 214 F.3d 1332, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000).

Insofar as opposer's sales and advertising figures are concerned, while they are indeed substantial, opposer has not provided a meaningful context for the figures, such as evidence of opposer's market share for the goods. As the Federal Circuit has stated, "[r]aw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading … Consequently, some context in which to place raw statistics is reasonable." Bose Corp. v. QSC Audio Prods., 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002). In this case, opposer has failed to put the figures in context in terms of where ENYCE ranks among clothing brands, in general, or even among urban lifestyle clothing brands, in particular. Also, unlike Bose, the record here

does not show that opposer's ENYCE clothing and accessories have received widespread critical attention. Thus, opposer's evidence falls short of establishing that opposer's ENYCE and ENYCE and design marks are truly famous. See Blue Man Productions Inc. v. Tarmann, 75 USPQ2d 1811, 1819 (TTAB 2005) ["In view of the extreme deference that is accorded to a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of a plaintiff asserting that its mark is famous to clearly prove it."].

Nonetheless, we acknowledge that the sales and advertising figures demonstrate that opposer's marks have achieved recognition, and in view of the distinctive nature of the term ENYCE, we find opposer's marks to be strong.

The du Pont factor of fame is neutral. The distinctiveness of opposer's ENYCE marks, however, weighs in opposer's favor.

The Goods

We next consider the du Pont factor regarding the similarity or dissimilarity of the goods. Applicant's goods are identified as "custom automotive accessories, namely, fitted car covers, shift knobs, brake pads, and wheels for land vehicles, license plate holders and spoilers for vehicles." Opposer's ENYCE and ENYCE and design

11

registrations cover clothing and accessories.  It is readily apparent that opposer's goods are different from applicant's goods.  However, it is a general rule that goods or services need not be identical or even competitive in order to support a finding of likelihood of confusion.  Rather, it is enough that goods or services are related in some manner or that some circumstances surrounding their marketing are such that they would be likely to be seen by the same persons under circumstances which could give rise, because of the marks used or intended to be used therewith, to a mistaken belief that they originate from or are in some way associated with the same producer or that there is an association between the producers of each parties' goods or services.  In re Melville Corp., 18 USPQ2d 1386 (TTAB 1991), and cases cited therein.

Moreover, "the greater the degree of similarity in the marks, the lesser the degree of similarity that is required of the products or services on which they are being used in order to support a holding of likelihood of confusion."  In re Concordia International Forwarding Corp., 222 USPQ 352, 356 (TTAB 1983).  See also, In re Shell Oil Co., 992 F.2d 1204, 26 USPQ2d 1687, 1689 (Fed. Cir. 1993) [Contemporaneous use of identical or nearly identical marks can lead to the assumption that there is a common source "even when [the]

12

good or services are not competitive or intrinsically related"].

As previously indicated, opposer's clothing and accessories are directed to the urban lifestyle market. According to opposer's vice-president, Mr. Felix, the urban lifestyle market largely finds its identity in its relationship to hip-hop and R&B music. Integral to the urban lifestyle market are clothing, jewelry, automobiles and automotive accessories. In this regard, Mr. Felix testified as follows:

> … car culture and car lifestyle is integrated in hip-hop lifestyle and hip-hop culture and urban culture. (Test. dep. at 38).

> Nice cars, nice fashion, urban lifestyle – all three of them go together and are interrelated. (Test. dep. at 67).

Further, Mr. Felix testified that the trendsetters within the urban lifestyle market typically are recording artists and athletes. These individuals dictate what style of clothing is fashionable, what type of jewelry is in vogue, and what automobile embellishments and accessories are desirable. Opposer submitted a large number of cover pages and advertisements from magazines directed to the urban lifestyle market. These cover pages and advertisements show recording artists and athletes wearing urban lifestyle clothing; many of them are alongside exotic cars.

Also, Mr. Felix testified that most hip-hop recordings include lyrics that make reference to exotic cars and custom car accessories, such as after-market wheels and rims.

> There's [sic] many references [in hip-hop music] towards high-end automobiles, exotic cars, exotic sports cars, expensive SUVs, expensive cars. And many times, there are references to the automotive accessories that are placed on these cars, whether it's the specific type of engine or the specific type of wheels, the size of the wheels.
> (Test. dep. at 85).

Much of the jewelry that is directed to the urban lifestyle market replicates decorative automotive wheels and rims. Opposer has submitted Internet printouts from websites at which this type of jewelry is offered for sale.

The record also shows that opposer itself has sponsored car shows, car show ticket giveaway contests, and a contest in which the winner was awarded a car featuring opposer's ENYCE and design mark in the paint job and on the headrests.

It is common knowledge, and a fact of which we can take judicial notice, that the licensing of commercial trademarks on "collateral products" has become a part of everyday life. See Turner Entertainment Co. v. Nelson, 38 USPQ2d 1942, 1945-1946 (TTAB 1996) and cases therein.

While opposer has not licensed its marks for automobiles or automotive accessories, Mr. Felix testified that opposer has used its ENYCE and ENYCE and design marks on a variety of merchandised items, i.e., shoes, scarves, key rings, umbrellas, action figures, luggage tags, cuff

links, flight tags, blankets, beach towels, sleep masks and skate boards.

In addition, the record shows use of the clothing brand marks EDDIE BAUER and L.L. BEAN on automobiles. Further, Mr. Felix testified that the urban lifestyle clothing brand, SEAN JOHN, is used on automobile wheels, and the urban lifestyle brand, MARK ECKO, has partnered with Nissan automobiles to develop a special edition vehicle.

We find that the uncontroverted testimony of Mr. Felix and the evidence of record demonstrates an association between urban lifestyle clothing and custom automotive accessories. Particularly in today's marketing environment, where the licensing of commercial marks is widespread, the purchasing public is likely to believe that applicant's customized automotive accessories come from or are sponsored by or associated with opposer.

As the Federal Circuit stated in Recot at 54 USPQ2d 1898: "Even if the goods in question are different from, and thus not related to, one another in kind, the same goods can be related in the mind of the consuming public as to the origin of the goods. It is this sense of relatedness that matters in the likelihood of confusion analysis." Similarly, in Hewlett-Packard v. Packard Press, Inc., 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002), the Court stated: "Even if the goods and services in question are not

15

identical, the consuming public may perceive them as related enough to cause confusion as to source or origin of the goods and services."

We find that in the sense discussed in the above cases, applicant's custom automotive accessories and opposer's urban lifestyle clothing and accessories are related goods. This du Pont factor favors a finding of likelihood of confusion.

Trade Channels

With respect to the trade channels, we recognize that clothing and accessories and custom automotive accessories are not typically offered in the same channels of trade.[8] Nonetheless, such goods would be offered to and encountered by the same classes of consumers. In this regard, we note that neither opposer's nor applicant's identifications of goods is restricted as to classes of purchasers. Accordingly, we must presume that the parties' respective goods are marketed to all the normal classes of purchasers for these types of goods, which would include ordinary consumers.

To the extent that the respective goods would be offered to and encountered by the same classes of consumers,

---

[8] Contrary to opposer's contention, the fact that the respective goods are advertised in the same magazines does not lead to the conclusion that such goods travel in the same trade channels.

this du Pont factor favors a finding of likelihood of confusion.

Conditions of Purchase

With respect to the du Pont factor of the conditions of purchase, many of the clothing items and accessories listed in opposer's identification of goods and the license plate holders listed in applicant's identification of goods are relatively inexpensive, impulse items. Purchasers of such goods are held to a lesser standard of purchasing care, and this du Pont factor therefore favors a finding of likelihood of confusion. Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., 748 F.2d 669, 223 USPQ 1281, 1282 (Fed. Cir. 1984).

Third-Party Use

The next du Pont factor we consider is the number and nature of similar marks in use on similar goods. Because there is no evidence of third-party use of the mark ENYCE of record, this factor is neutral, and insofar as it shows the strength of opposer's marks, it favors opposer.

Applicant's bad faith

Under the thirteenth du Pont factor, evidence of applicant's bad faith adoption of his mark is relevant to our likelihood of confusion analysis.

With respect to his adoption of the ENYCE mark, applicant testified that he independently thought to use the

mark on automotive accessories. According to applicant, he invented the ENYCE mark by adding the letter "e" to the beginning and end of "NYC," the abbreviation for New York City; and that if his brand strategy worked, he would add the letter "e" to the beginning and end of the city names/nicknames Detroit, LA, Philly, and Chicago, in order to build additional brands. When applicant was asked why he thought that ENYCE would be a good trademark for custom automotive accessories, he responded: "Why. I don't know. I don't even know how to answer that question." (Disc. dep. at 41).

Opposer's vice-president, Mr. Felix, testified that MECCA is also an urban lifestyle clothing brand, and the record shows that a third-party owns registrations for the MECCA mark for clothing. Opposer's counsel asked applicant about applicant's application, filed in August 2003, to register the mark MECCA for goods which are identical to those involved herein, i.e., custom automotive accessories. Applicant testified that he adopted the MECCA mark in 2003 as a reference to the city by that name, but that he later abandoned the application in 2004 because of the anti-Muslim sentiment in the United States after September 11, 2001. Opposer's counsel asked applicant to explain how the anti-Muslim climate in the United States changed between 2003 and 2004. Applicant's response was "I don't know, I don't

recall." (Disc. dep. at 133). When asked whether it was a coincidence that he has tried to register for custom automotive accessories two urban lifestyle clothing brands, applicant's response was "Don't know." (Disc. dep. at 149).

Applicant's explanation of his adoption of the ENYCE mark and his "strategy" to build additional brands strains credulity. This, coupled with the fact that applicant was unable to articulate whey he thought ENCYE would be a good mark for his goods, and his inability to explain why he has tried to register two urban lifestyle clothing brands for custom automotive accessories, leads us to the conclusion that applicant's adoption of the ENYCE mark was in bad faith, with the intention to trade off of opposer's ENYCE mark. Such bad faith is strong evidence that confusion is likely, as such an inference is drawn from the imitator's expectation of confusion. See Broadway Catering Corp. v. Carla Inc., 215 USPQ 462 (TTAB 1982). See also DC Comics, Inc. v. Powers, et al., 465 F.Supp. 843, 201 USPQ 99 (SDNY 1978).

The du Pont factor of bad faith is resolved in favor of finding a likelihood of confusion.

Conclusion

In sum, when we consider the evidence of record in light of the relevant du Pont factors, we conclude that there is a likelihood of confusion. The marks of the

parties are identical/highly similar, opposer's marks are strong, the goods are related, the classes of purchasers are overlapping, some of opposer's and applicant's goods are inexpensive, impulse purchases, and applicant acted in bad faith in adopting his mark.  If prospective purchasers were to encounter the mark ENYCE on custom automotive accessories, they would be likely to believe that these products come from, are sponsored by or associated with the source of the ENYCE and ENYCE and design clothing and accessories.

### Applicant's lack of a bona fide intention to use the applied-for mark

Opposer maintains that when applicant filed his application, applicant lacked the requisite bona fide intention to use the ENYCE mark in commerce on the identified goods.  The determination of whether applicant had the requisite bona fide intention to use the mark ENYCE on the goods identified in the application must be a fair objective determination based on all of the circumstances. See Lane Limited v. Jackson International Trading Company Kurt D. Bruhl Gesellschaft m.b.G. & Co. KG, 33 USPQ2d 1352 (TTAB 1994); and Commodore Electronics Ltd. v. CBM Kabushiki Kaisha, 26 USPQ2d 1503 (TTAB 1993).  The Board held in Commodore, at 26 USPQ2d 1507, that "absent other facts which adequately explain or outweigh the failure of an applicant to have any documents supportive of or bearing upon its

claimed intent to use its mark in commerce, the absence of documentary evidence on the part of an applicant regarding such intent is sufficient to prove that the applicant lacks a bona fide intention to use the mark in commerce as required by Section 1(b)."

Applicant, in his answers to opposer's interrogatories and document production requests, indicated that he had no documents evidencing an intent to use the ENYCE mark on custom automotive accessories. With regard to his intent to use the ENYCE mark, applicant testified as follow:

Q. Did you intend – when you filed this [application] did you intend to actually use [the ENYCE mark] on all these goods?

A. Again, there is no business model associated with this until I receive permission to go ahead and use it and then the business model will be produced.

Q. That's not the question. When you filed this application, serial number 78320850, did you intend to use the mark ENYCE on fitted car covers?

A. Perhaps –

Q. It's a yes or no answer.

A. I don't have any – there's no specific intentions at this time.

Q. No. At that time though. At the time you filed the application.

A. A car bra, if you want to call that a fitted car cover.

Q. Is that a fitted car cover?

A. Yes, I guess.

Q.  Shift knobs?

A.  Shift knobs, yes.

Q.  You intended to use ENYCE on shift knobs.

A.  Yes.

Q.  On brake pads?

A.  Probably not.

Q.  No?

A.  No.

Q.  You didn't intend to use ENYCE on brake pads?

A.  No.

Q.  License plate holders?

A.  Probably.

Q.  Spoilers?

A.  Probably.

(Disc. dep. at 107-108).

This testimony offers no facts which explain or outweigh the failure of applicant, when he filed the application, to have documents which support his claimed intent to use the ENYCE mark in connection with custom automotive accessories.  Applicant's decision to forgo a business model until after the opposition is decided does not explain his failure to have any documents whatsoever at the time the application was filed that showed an intent to use the mark.  Moreover, applicant's mere response that he intended to use the ENYCE mark on shift knobs does not

22

suffice to establish a bona fide intention to use the mark. The mere assertion of an intent to use the mark without corroboration of any sort, whether documentary or otherwise, is not likely to provide credible evidence to establish a bona fide intention to use the mark.  The context of the other answers given here detracts, rather than contributes, to the credibility of the assertion and thus supports the conclusion that applicant has not established a bona fide intention to use the mark when he filed the application.

Conclusion

In view of the foregoing, we conclude that applicant did not have a bona fide intention to use the ENYCE mark in commerce on custom automotive accessories when he filed the involved application.

**Decision**:  The opposition is sustained on the grounds of likelihood of confusion and lack of a bona fide intention to use the mark in commerce on the identified goods.